AFFILIATED HOSPITAL PRODUCTS, INC., *et al.*, Plaintiffs-Appellants, *v.* BRIAN BALDWIN *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 77-637

Opinion filed January 18, 1978.—Modified on denial of rehearing March 22, 1978.

Robert Wilder, Roger L. Price, and Mark T. Neil, all of Chicago (Aaron, Aaron, Schimberg & Hess, of counsel), for appellants.

Michael W. Ford, Randall L. Mitchell, and Mark Cohen, all of Chicago (Chapman and Cutler, of counsel), for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, Affiliated Hospital Products, Inc. (hereinafter "Affiliated"), and MPL, Inc., appeal from an order of the circuit court of Cook County denying MPL's motion for a preliminary injunction. The injunction was sought to restrain defendants from manufacturing and shipping machines abroad which MPL alleged were designed and built utilizing their trade secrets. Although the trial court found that plaintiffs did possess trade secrets, it concluded that defendants had not utilized or copied this confidential information in manufacturing their machines. Plaintiffs contend that the denial of MPL's motion for a preliminary injunction constituted an abuse of the trial court's discretion.

MPL is a manufacturer of disposable hypodermic needles and related products. It is a wholly owned subsidiary of Affiliated. Defendant Baldwin was MPL's president and chief operating officer from 1968 until August 14, 1974, when he received notice of his termination. Bernard Fein, president of Affiliated, testified that Baldwin was discharged because he had breached his fiduciary obligations to MPL. By the time he became president of MPL, Baldwin had years of experience in the needle industry. During the early days of MPL he worked in all areas of product and machine design.

In 1968 Baldwin concluded an agreement to sell the assets of MPL to Affiliated. As part of this transaction, Baldwin signed an employment contract which contained covenants against competition and against disclosure of confidential information. The contract expired in 1973 and was not renewed by Affiliated. Early in 1974, Baldwin, with permission from Affiliated, organized defendant Hypomed Corporation to re-acquire MPL's assets from Affiliated. The acquisition was not completed before Baldwin's termination.

Subsequent to his discharge in August 1974, Baldwin arranged with the defendant Manan Tool and Manufacturing, Inc., and its secretary-treasurer, defendant Mittermeier, to locate his office next to Manan's and to collaborate on several projects Baldwin had in mind. Principal among these was the design and construction of machinery to process hypodermic needles. The remaining defendants, Anderson, Scalfaro, Faro Services, Inc., and Avgerenos d/b/a NGA & Associates, were all designers or builders of this machinery. Defendant Colonial Farms, Inc., was at some point after the commencement of these proceedings given title to some of the machinery.

While Baldwin was president of MPL he attempted to maintain the confidentiality of MPL's proprietary data through various means. Visitors at MPL's plant were required to sign a "Plant Visitation Agreement"

which prohibited disclosure or use in any manner of any information gleaned in the course of the visit. Mittermeier, as well as others associated with Manan, had visited MPL's facilities and had signed this agreement. Reports concerning MPL's internal affairs and negotiations with outside interests all reflected Baldwin's concern that certain equipment and techniques be kept in the strictest confidence. All salaried and supervisory employees of Affiliated and MPL were required to sign an "Employee Invention and Confidential Information Agreement" which prevented disclosure of any matter relating to the business of either company during the duration of employment or at any time thereafter. Baldwin testified at these proceedings that MPL had no trade secrets.

We shall attempt to describe the various machines which form the subject matter of this suit and briefly summarize the evidence relating to defendant's alleged misappropriation of plaintiffs' trade secrets. The first phase of the manufacture of disposable hypodermic needles in both the MPL and Hypomed systems is the cutting of long strands of stainless steel tubing to prescribed lengths. After these pieces are ground to a point, they are called "cannula." The machine used for this phase of production is called a full load cut off machine. While Baldwin was president of MPL, he had contracted out certain work to defendants Manan and Mittermeier, but this had never included the construction of a full load cut off machine or any part thereof. Shortly before Baldwin's discharge from MPL, Mittermeier received from MPL a folder of MPL drawings with a request for a quotation for the construction of a duplicate full load cut off machine. After Baldwin left MPL, Mittermeier was told by an MPL employee to hold off on his quote and to retain the drawings.

In early 1975 Baldwin instructed Mittermeier to construct a full load cut off machine for Hypomed. Mittermeier contracted with Faro and its president, Scalfaro, for the design of the machine. Neither Scalfaro nor any Faro employee had any specialized knowledge about tube cutting devices or a full load cut off machine. Mittermeier and Scalfaro met at Manan's offices at which time Mittermeier gave Scalfaro the folder of MPL drawings he previously had received. Mittermeier told Scalfaro to refer to these drawings and to incorporate those features of the MPL full load cut off machine he found useful.

Scalfaro took the MPL drawings and eventually hired Avgerenos to design the Hypomed full load cut off machine. Scalfaro gave Avgerenos the drawings and told him that the cut off machine "was to look like the drawing that we had." Avgerenos had only the MPL drawings to study, and did not discuss the design of the machine with Baldwin prior to working on his drawings for Scalfaro. Prior to working for Manan, he had never seen such a machine. Avgerenos specifically recalled receiving MPL assembly drawings which depicted all the facets of the full load cut off

machine. He studied the drawings "to see how they were doing it" because "he had to know what * * * to do."

Mittermeier, Scalfaro and Avgerenos thereafter met at Manan where they reviewed Avgerenos' concept drawings. At one meeting, Mittermeier made some sort of mark on what was later identified as the assembly drawing for the MPL full load cut off machine. Avgerenos and Mittermeier jointly referred to MPL drawings while they were discussing the design of the Hypomed full load cut off machine. Avgerenos maintained that he had not incorporated any MPL full load cut off machine features into his concept drawings and that the Hypomed machine was designed from his past experience.

While the testimony of several expert witnesses established that certain features on the MPL and Hypomed full load cut off machines were similar, none were willing to testify that the two machines, or any parts thereof, were identical. Baldwin knew that Mittermeier had possession of the MPL drawings, but could not recall if he was aware that they were given to Avgerenos.

The next phase of processing the needles involves a machine known as a grinder. After the tubes have been cut by the full load cut off machine, this machine grinds a tri-bevel point on each tube. While Baldwin was president, MPL entered into a license agreement for the grinder with Tooling Services of Johannesburg, South Africa, wherein the licensee agreed that all "processes, * * * information, know-how, equipment and inventions * * *" remain the confidential property of MPL. After leaving MPL, Baldwin offered MPL machinery as a demonstrator for machinery proposed to be licensed from Hypomed.

Once again, Baldwin requested Mittermeier to design and build the grinder. Mittermeier had more than 50 MPL drawings for the grinder, including several depicting the entire grinder fixture. He could not remember from whom he obtained them. Mittermeier hired defendant Anderson to help with the design for the grinder. Anderson had never seen a grinder or worked on a design for one. Mittermeier testified that Anderson and he referred to the MPL drawings. He identified 13 such drawings which he "looked at and used." He also stated that the actual incorporation of any MPL features into the Hypomed grinder was done by Anderson. The latter remembered referring to MPL drawings while he was working on his design for the grinder, but denied incorporating or copying any MPL features into his grinder design. Mittermeier designed a part for the grinder referred to as a loadbar. He referred to the MPL loadbar drawings and might have referred to an actual loadbar he had made previously for MPL. He testified that no one at MPL had ever told him that the loadbar drawing, or any other MPL drawing sent to Manan, was confidential or was not to be referred to. Expert testimony

established that several parts of the MPL and Hypomed grinders were similar. However no witness testified that the two grinders, or their component parts, were identical.

Hypomed also manufactured two larger grinders, using the smaller grinder as a prototype. Mittermeier hired R. D. Systems, operated by James Ribordy, to design and build these two machines. Ribordy was not an engineer and had no background in the manufacture of hypodermic needles. Ribordy was given all the drawings for the small grinder which plaintiffs claimed incorporated MPL grinder features. The productivity of these two larger grinders was significantly higher than that of the MPL grinder.

Once a load of needles is ground, burrs or small particles of metal often remain in the heel area of the tri-bevel point and must be removed. This is accomplished by a machine called a blaster which bombards the heel area with air-driven glass beads. The stream of glass beads flows through the interior of a converging-diverging nozzle which allows the beads to achieve a high speed with a precise, narrow flow pattern. In describing his accomplishments at MPL, Baldwin referred to this process as a "unique precision glass bead blast system."

While examining a file of defendants' drawings for the Hypomed blaster, one of plaintiffs' expert witnesses found an MPL nozzle drawing with the title block removed. Mittermeier testified that he removed the title block before giving the drawing to Ribordy "because it was none of his business to know where I got the drawing. There's no need for him to know." The MPL drawing was the only nozzle drawing contained in defendants' file. Mittermeier stated that it was used in the design of the Hypomed blaster. Along with the grinder, the blaster was licensed to Tooling Services of Johannesburg and then to American Hospital Supply, the licensees agreeing to maintain the machine's confidentiality. After Baldwin left MPL, he proposed to license the machinery to Holgrath Company and he informed Mittermeier that a condition of the license would be that the machinery and drawings be kept confidential.

None of the expert witnesses had ever seen a converging-diverging nozzle used by any company in the needle industry other than by Hypomed and MPL. Other competitors use straight bore nozzles.

After deburring by the blaster, the needles must be cleaned. The standard method used in the industry is an ultrasonic wash technique. MPL, however, employs a high speed centrifuge which washes, rinses and dries the needles. After leaving MPL, Baldwin determined that a soak solution could eliminate the need for washing in the centrifuge. In the Hypomed machine, the centrifuge performs only the rinsing and drying functions. In the fall of 1974, Baldwin requested Mittermeier to design a needle centrifuge. A small machine was designed by Anderson who

turned his design over to Avgerenos so that he could design a larger capacity machine. Neither Anderson nor Avgerenos had ever seen a needle centrifuge before this project.

The final step in the processing of cannula is the lubrication of the needles. In answer to plaintiffs' interrogatory, Baldwin acknowledged that the formula for the lubricant constituted proprietary data of MPL. After leaving MPL Baldwin disclosed this formula to William Cook, his present associate. Baldwin does not know yet what kind of lubricant he intends to use at Hypomed, but it most likely will be a commercially available silicone.

■■ Plaintiffs first contend that in considering MPL's request for a preliminary injunction the trial court employed an incorrect legal standard to determine whether or not plaintiffs' trade secrets were misappropriated by defendants. Plaintiffs claim that the trial court required MPL to show that its plans and techniques, found to be trade secrets, were not merely used but literally copied by defendants. If this were true, we would agree that the trial court imposed too stringent a burden of proof. (See *Forest Laboratories, Inc. v. Pillsbury Co.* (7th Cir. 1971), 452 F.2d 621.) However, from our reading of the record and of the trial court's decision, we find that the court understood and applied the correct legal standard, namely, whether defendants acquired by improper means or used without authorization plaintiffs' trade secrets. See *Kewanee Oil Co. v. Bicron Corp.* (1974), 416 U.S. 470, 40 L. Ed. 2d 315, 94 S. Ct. 1879.

Plaintiffs next argue that, having found MPL's plans and techniques to be trade secrets, the trial court erred in finding that MPL was not entitled to a preliminary injunction. Plaintiffs rely principally on Baldwin's efforts to maintain the confidentiality of MPL's operations and the other defendants' subsequent possession of and reference to MPL drawings. It is undisputed that Mittermeier, Scalfaro, Avgerenos, and Anderson had at some point seen or referred to MPL drawings in connection with the design and construction of the machinery in question. Plaintiffs maintain that this evidence is sufficient to support the issuance of a preliminary injunction in order to maintain the status quo.

Defendants counter that every witness who admitted having MPL blueprints denied copying any information from those drawings or otherwise incorporating them into designs for Hypomed machinery. Furthermore, expert testimony indicated that MPL and Hypomed machines were dissimilar and that the latter were generally more productive than their MPL counterparts. Defendants thus maintain that the trial court properly found that the design and construction of the Hypomed machinery were attributable solely to Baldwin's extensive experience and the other defendants' expertise in their particular fields.

■■ The decision to award the extraordinary remedy of preliminary injunctive relief rests within the sound discretion of the trial court. (*Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill. App. 3d 338, 290 N.E.2d 701.) While a showing of a substantial likelihood that the movant will prevail on the merits is required, absolute certainty of ultimate success is not a prerequisite to an award of preliminary relief. As the court stated in *C. G. Caster Co. v. Regan* (1976), 43 Ill. App. 3d 663, 666, 357 N.E.2d 162, 165:

> "[A] party is not required to make out a case which in all events will warrant relief at the final hearing. All that is necessary is that the petitioning party raise a fair question as to the existence of the right claimed and lead the court to believe he probably will be entitled to the relief prayed for if the proof should sustain his allegations."

With the above standard in mind, we believe that the trial court abused its discretion in not issuing a preliminary injunction in behalf of MPL.

■■ From our reading of the record, it is undisputed that at some point prior to the manufacture of the Hypomed machinery the defendants had possession of and made reference to drawings which the trial court found to be confidential property of MPL. As we have noted, while Baldwin was at MPL, he took great care to maintain the secrecy of what he considered to be MPL's proprietary data. Whether or not this information actually gave MPL a competitive advantage, the fact that it was confidential and treated as such is sufficient to show that this information constituted a trade secret. (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865; *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 228 N.E.2d 742.) The trial court properly found that the MPL drawings, alleged to have been misappropriated by defendants, were trade secrets. Defendants argue that it is impossible to tell which information the trial court was referring to when it found that plaintiffs possessed trade secrets and that, therefore, the MPL drawings in defendants' possession may have contained only information which was already in the public domain. However, when the trial court ruled that plaintiffs did possess trade secrets, defendants sought no further clarification. We therefore must assume that the trial court intended to encompass in its ruling all the information which plaintiffs alleged constituted proprietary data of MPL. Mittermeier, Scalfaro, Avgerenos, and Anderson each had all or part of this same information while they were working on various projects for Hypomed. With the exception of Mittermeier who had designed parts for MPL, none of the other defendants had prior experience with the design of machinery for the manufacture of disposable hypodermic needles. The evidence of use of plaintiffs' trade secrets is most apparent with reference to defendant Avgerenos. Avgerenos was contacted by Scalfaro to design the full load cut off machine. Avgerenos had not met previously with

either Baldwin or Mittermeier to discuss the proposed design of this machine and, prior to the request, had never designed such a machine himself. Admittedly using the MPL drawings as a reference, he completed his design for a full load cut off machine in approximately eight to ten weeks. In contrast, the MPL full load cut off machine was the result of five years of experimentation and design work. The conclusion is inescapable that Avgerenos, having only limited experience in this field, received the benefit of MPL's labors. (See *Kelite Corp. v. Khem Chemicles* (N.D. Ill. 1958, 162 F. Supp. 332.) While independent experimentation may have yielded the same results, the fact remains that Avgerenos had only MPL drawings to study. A more positive indication of assimilation of information from these drawings, albeit unconscious and unintentional, would be difficult to imagine. (See *Booth v. Stutz Motor Car Co. of America* (7th Cir. 1932), 56 F. 2d 962.) The same inference must be drawn with respect to the other defendants. While they may have been familiar with the devices or techniques used in these machines, each admitted that he looked at or referred to MPL plans. Even accepting their denial of any literal copying of MPL drawings, these drawings aided defendants in the design of Hypomed machinery, if only to demonstrate what pitfalls to avoid. (*Revcor, Inc. v. Fame, Inc.*) That the end product, the machine itself, is in the public domain is not determinative. The plans and techniques admittedly referred to by defendants were entitled to confidentiality. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 273 N.E.2d 393.

■■ Baldwin's acknowledged experience and expertise in the field does not alter our conclusion. While he himself may have been able to reproduce designs for the machinery without the aid of MPL plans, the fact remains that he did not. It is no defense that the design or process in question could have been developed independently and without resort to confidential information. (*Sperry Rand Corp. v. Rothlein* (D. Conn. 1964), 241 F. Supp. 549; *Revcor, Inc. v. Fame, Inc.*) Moreover, instead of using any designs developed independently by Baldwin, the other defendants admittedly referred to MPL drawings. Use by these defendants of MPL's proprietary data cannot in any way be said to be a legitimate application of Baldwin's expertise.

■■ The fact that Baldwin developed these trade secrets either alone or with other MPL employees cannot insulate defendants. Baldwin was entitled to use the expertise gained during his tenure with MPL in competition with MPL after his termination. However, he was not entitled to take with him or to allow others to use the actual plans and specifications which belonged to MPL. (*Sperry Rand Corporation v. Rothlein.*) The fact that Baldwin's employment contract with MPL, containing the prohibition against disclosure of confidential information

either during or after the termination of employment, had expired is not relevant. Baldwin acquired this confidential information while he stood in a fiduciary relationship to MPL. The duty not to disclose such information exists apart from any express contract. *Head Ski Co. v. Kam Ski Co.* (D. Md. 1958), 158 F. Supp. 919.

Mittermeier argues that he was unaware that the MPL drawings given him were confidential. They were not so marked and he was never told not to use them by anyone from MPL. This argument is unconvincing. Mittermeier signed the MPL agreement at its plant which prohibited disclosure or use in any manner of any information gained during the visit. This act put him on notice that MPL considered its method of manufacturing disposable hypodermic needles a secret. Additionally, even though he received several MPL drawings which were not marked as confidential, common sense dictates that he could not reasonably believe that he was entitled to use them in competition with MPL. Moreover, Mittermeier was aware of a proposed licensing agreement with Holgrath Corporation which prohibited disclosure of the drawings or reproduction of the entire line of machinery for the manufacture of disposable hypodermic needles. This agreement pertained to machinery for which Mittermeier possessed MPL drawings.

Defendants have stressed the marked differences between the MPL and Hypomed machinery. Great reliance is placed on the fact that the Hypomed product is much improved through defendants' efforts. This fact is insufficient to warrant a denial of preliminary relief where use of plaintiffs' trade secrets has been established. *Forest Laboratories, Inc. v. Pillsbury Co.* (7th Cir. 1971), 452 F.2d 621.

Defendants, citing *Schulenburg v. Signatrol, Inc.* and *I.L.G. Industries, Inc. v. Scott,* maintain that MPL's request for injunctive relief was denied because it failed to prove that the duration of the restraint sought would not exceed the time necessary for Baldwin lawfully to design and construct the machinery in question. Defendants argue that since no machinery has been sold to plaintiffs' competitors after Baldwin's termination in 1974, plaintiffs, in effect, have been protected for approximately 3½ years. Relying principally upon Baldwin's acknowledged expertise, defendants contend that Baldwin independently could have designed and constructed the machinery during this period and that, therefore, MPL is not entitled to extend the duration of protection against disclosure by injunction.

In support of this argument, defendants also cite *Northern Petrochemical Co. v. Tomlinson* (7th Cir. 1953) 484 F.2d 1057. In that case, defendants were found to have acquired illegally plaintiff's confidential information. Nevertheless, the court held that plaintiff was not entitled to injunctive relief since defendants voluntarily had refrained

from utilizing the information for so long as it would have taken them to develop it independently. In the present case, we cannot agree that defendants have exercised such voluntary restraint since 1974. Baldwin offered MPL machinery as demonstrators for Hypomed machinery to prospective licensees. The availability of plaintiffs' confidential information to defendants enabled them to negotiate with those customers after Baldwin left MPL.

■■ We believe plaintiffs have established sufficient facts to warrant the issuance of preliminary injunctive relief. We, therefore, direct the trial court to issue a preliminary injunction. In view of our holding, it is unnecessary for us to consider additional errors in evidentiary rulings raised by plaintiffs.

For the foregoing reasons, the order of the circuit court of Cook County denying MPL's request for a preliminary injunction is reversed, and the cause is remanded for further proceedings consistent with the holdings of this opinion.

Reversed and remanded.

JIGANTI, P. J., and SIMON, J., concur.