**SYNTEX OPHTHALMICS, INC., et al., Plaintiffs,**

v.

**Nick N. NOVICKY, et al., Defendants.**

**No. 80 C 6257.**

United States District Court,
N.D. Illinois, E.D.

Dec. 12, 1983.

Holland C. Capper, Chicago, Ill., for plaintiffs.

Randy G. Black, McLennon, Nelson & Nudo, Park Ridge, Ill., McDougall, Hersh & Scott, Chicago, Ill., for Nick N. Novicky.

Gerald Geren, Epton, Mullin, Segal & Druth, John T. McEnroe, James T. FitzGibbon, Chicago, Ill., Howard M. Peters, Palo Alto, Cal., Roger Milgrim, Milgrim, Thomajan, Jacobs & Lee, New York City, for Tsuetaki and Fused Kontacts of Chicago, Inc.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

*Introduction*

Plaintiffs, Syntex Ophthalmics, Inc. (Syntex), and Arapahoe Chemicals Inc. (Arapahoe)[1], brought this trade secret/patent infringement suit against a former employee, Nick Novicky (Novicky), Novicky's subsequent employer, Fused Kontacts of Chicago, and that corporation's president, George Tsuetaki (collectively referred to as Tsuetaki). Plaintiffs claimed title to patents obtained by Novicky (the Novicky patents) and sought injunctive and monetary relief for patent infringement and misappropriation of trade secrets concerning chemical formulae and manufacturing processes used in the production of silicone-containing, gas-permeable, rigid contact lenses.

On May 4, 1981, the court severed Syntex's patent infringement claims pending resolution of the patent ownership and trade secret claims. On May 6, 1982, the court entered a preliminary injunction enjoining the defendants from using certain chemical compounds and process steps in dispute between the parties. *Syntex Ophthalmics v. Novicky*, 214 U.S.P.Q. 272 (N.D.Ill.1982), *aff'd*, 701 F.2d 677 (7th Cir. 1983).[2] On June 13, 1982, partial summary judgment for Syntex entered, upholding its title to the patents with the court relying on a settlement agreement between Syntex and Tsuetaki and collateral estoppel from a prior state court judgment against Novicky. *Tsuetaki v. Novicky*, No. 80 CH 4724 (Cir.Ct. Cook Cty. Ill. Jan. 13, 1981).[3] After settling with Tsuetaki, Syntex filed a stipulation of voluntary dismissal of all claims against Tsuetaki on June 15, 1983 under Fed.R.Civ.P. 41(a)(2).

After the final pretrial conference, Syntex dismissed with prejudice all claims against Novicky for damages from Novicky's alleged theft of trade secrets under Count I of the complaint incurred up to and including the date of the dismissal. Syntex reserved its claims to all other available relief, including a permanent injunction, costs, and attorneys' fees. Syntex dismissed without prejudice its remaining

---

1. Arapahoe Chemicals has changed its name to Syntex Chemicals. At the time of the alleged trade secret theft, the company was known as Arapahoe; therefore, the court uses this name. *See infra* note 3.

2. At trial, the court reserved judgment on Novicky's motion to amend this order. The injunction that will issue in accordance with this opinion will replace the May 6, 1982 order and constitute, with this opinion, the court's ruling on Novicky's motion to amend.

3. During final preparation of this opinion, the court became aware of an Illinois appellate court decision that reversed the state trial court. The patent ownership issues are separate from the trade secret issues that the parties addressed at trial and that this court addresses in this opinion. Therefore, the appellate court ruling has no effect on the court's attached findings of fact and conclusions of law regarding the trade secret claims.

claims under Count II for damages for past and present infringement of the Novicky patents and for an injunction against future infringement of them.[4] In return, Novicky stipulated that (a) Syntex need not prove the requirement under *Schulenburg v. Signatrol,* 33 Ill.2d 379, 212 N.E.2d 865 (1965), *cert. denied,* 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966), that defendant profited from the theft to the detriment of plaintiffs and (b) the following would not be issues at trial: (1) patent validity, (2) dates of invention, (3) identity of inventors, and (4) the relationship of one patent to the other. The parties also excluded issues of (1) Syntex's compliance with FDA regulations, (2) the testimony of Warren D. McPhee on preliminary injunction issues,[5] and (3) the grounds for appeal of the state court judgment against Novicky in favor of Tsuetaki.

The court conducted a trial on the claim for injunctive relief for trade secret misappropriation on June 22–23 and June 27–30, 1983. Novicky represented himself at trial, but he employed an attorney until the eve of trial when his attorney sought leave to withdraw. The court enters the following findings of fact and conclusions of law.[6]

## I. *Findings of Fact*

Novicky's use of information that he obtained while working for Arapahoe is inter-twined with the invention and development of advanced types of contact lenses. The court must begin with the background of this technology.

### A. *History of Gas-Permeable Contact Lenses*

Contact lenses are made of plastics called polymers that are made through a process called polymerization. Polymerization takes place when a chemical called a free radical initiator is added to a mixture of monomers, compounds that will polymerize. The process creates a series of cross-linking chemical bonds among the monomers. The extent of the cross-linking determines the physical properties of the polymer (a plastic formed from one monomer) or copolymer (a plastic formed from a mixture of different monomers). The cross-linking depends on the nature of the monomers, the initiator, and the reaction conditions, *e.g.,* pressure and temperature. To make contact lenses, the manufacturer forms the polymers into rods and slices them into discs (buttons) which the manufacturer grinds into lenses.

Before the development of rigid, gas-permeable contact lenses, contact lens wearers wore either "soft" or "hard" contact lenses. The former provided suboptimal vision for some, required great care, supported bacterial growth, and wore out quickly. The original or hard lenses did

---

**4.** Since the final pretrial conference, Syntex has contended that it does not seek relief from Novicky's use of the processes and materials within the literal claims of the Novicky patents. Syntex will resort, if necessary, to a patent infringement action to protect its rights to the information disclosed in the patents. Therefore, this action does not involve Novicky's right to processes and materials within the claims of the Novicky patents.

**5.** The court appointed Warren McPhee as an expert to help the court institute the preliminary injunction.

**6.** Syntex has moved to strike Novicky's testimony about telephone conversations that he had with Dr. Courtland Spicer (Spicer) after Novicky left Syntex. The court denies the motion. Fed.R.Evid. 801(d)(2)(D) provides that a statement is *not* hearsay if "[t]he statement is offered against a party and is … a statement by his

agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Spicer's alleged statements fall within this hearsay exclusion. He was an agent of Syntex when he made the statements. Since Spicer supervised Novicky on the POLYCON project, his statements related directly to his responsibilities at Syntex. Because the court concludes, given all the evidence, that Syntex waived no rights and protected its trade secrets, the court fails to find unfairness in making the testimony part of the record. Based on Novicky's demeanor, the court was able to judge Novicky's credibility about the content of these alleged discussions. Although Novicky testified about the conversations after Spicer left town, Spicer did testify that he could not recall the content of other conversations that took place at about the same time. In addition, Syntex took full advantage of its right to cross-examine Novicky about his descriptions of the conversations.

not have these disadvantages, but they failed to allow oxygen to reach the wearer's cornea. This lack of oxygen permeability prevented wearing the lenses for extended periods and sometimes led to corneal swelling caused by oxygen deprivation to the cornea. These original hard lenses were made of a polymer called polymethymethacrylate (PMMA).

In the mid-1970s, researchers discovered that by using a silicone derivative of methylmethacrylate, the monomer used in PMMA, they could produce a rigid plastic with the desired optical properties that was gas-permeable. Rigid, gas-permeable lenses became possible. They gave the user extended wear and lower incidence of corneal swelling. They required less maintenance and provided more durability and better vision than soft lenses. This discovery led directly to the POLYCON project at Syntex and this suit.

## B. *The POLYCON Project*

In early 1977 after it acquired Polymer Optics Corporation (POC), Syntex, (U.S.A.), Inc., formed Syntex Ophthalmics.[7] The acquisition of POC provided the foundation for the POLYCON project as it included the purchase of United States Patent No. 3,808,178 and a pending application that became United States Patent No. 4,120,570. These patents were named the Gaylord patents after Norman Gaylord (Gaylord), the inventor who pioneered application of silicone-PMMA chemistry to the contact lenses field. Gaylord later consulted with Syntex about the commercial development of the POLYCON process. Syntex (U.S.A.) also purchased confidential and proprietary trade secret rights regarding laboratory

manufacture of silicone-PMMA contact lenses. Preliminary work at POC related to a commercial process and product.[8]

Once incorporated, Syntex started the POLYCON project to develop a procedure for manufacturing a commercially feasible silicone-PMMA gas-permeable contact lens. The point of the project was to optimize the physical properties of the polymers for use in contact lenses. Relevant properties included oxygen permeability, wettability (important to ensure that the lenses would absorb rather than repel tears), rigidity, and transparency. Syntex optimized these characteristics by varying reaction conditions and perfecting procedures for manufacturing the monomers and carrying out the final polymerization. It developed analytical procedures to regulate the quality of the final product in conformity with Food and Drug Administration (FDA) regulations.

From May, 1977 until May 1978, Syntex spent more than one million dollars and twenty man-years on POLYCON to develop the process details for manufacturing commercially satisfactory silicone-PMMA contact lens material. The Arapahoe batch sheets (the batch sheets)[9] and the accompanying analytical methods and specifications (the FDA master file or master file) contained the information generated from this expenditure of money and effort. In January, 1979, the FDA approved Syntex's silicone-PMMA contact lenses. Syntex designated the monomer for which it sought FDA approval as "T-2." Since then, Syntex has successfully made and sold its lenses under the trademark POLYCON.

7. Syntex Ophthalmics (Syntex) and Arapahoe Chemicals (Arapahoe) are wholly owned subsidiaries of Syntex (U.S.A.), Inc., a Delaware corporation with its principal place of business in California. Syntex Ophthalmics and Arapahoe are both Delaware corporations. Syntex has its principal place of business in Colorado. Arapahoe manufactures fine and specialty chemicals, including the silicone-PMMA chemicals used by Syntex to make contact lenses. Therefore, for simplicity, this court refers to Arapahoe and Syntex interchangeably and distinguishes the two only when necessary.

8. Apparently as part of this transfer, Syntex also obtained laboratory notes created by a Florida company called Peninsula Chem Research (PCR). Before Syntex bought the technology, this company had produced material similar to the material that became known as POLYCON.

9. A batch sheet is a cross between a recipe from a cookbook and a laboratory notebook. The batch sheet contains instructions about how to carry out a procedure or reaction with spaces for the chemist to enter data about reaction conditions and results.

Syntex worked to preserve the confidentiality of its trade secrets. It restricted access to the Arapahoe Research and Development Department to only those employees and consultants, such as Dr. Gaylord, who had signed secrecy agreements. Laboratory notebooks and batch records were under lock and key. Only those who needed information in confidential reports received them. The building housing the POLYCON laboratory remained locked after business hours. Visitors had to register, and employees accompanied them during their visit. While orienting new employees, Arapahoe's personnel department specifically reviewed the Employee Handbook and paragraphs three and four of the employment agreement which established the duty not to disclose confidential information. At orientation, employees also learned that everything that they did or learned was secret and subject to that duty. Dr. Courtland Spicer, a supervisor on the project, told his employees that the information in the batch sheets was valuable and confidential. Syntex never published the batch sheets or the analytical methods.

C. *Novicky's Employment with Syntex*

Defendant Novicky began working for Arapahoe in 1973 as an analytical technician. When he started work, he signed a standard Syntex employment agreement that contained one clause promising confidentiality and another clause assigning all ideas and inventions originating, conceived, acquired, or developed by him while at Syntex. He tested samples to produce data about Syntex's manufacturing processes.

In 1977, Syntex promoted Novicky to chemist and assigned him to the POLYCON project. His duties included setting up a laboratory, organizing a small staff of people to assist him, and developing a commercial scale process for manufacturing the POLYCON polymer and rods. He started his research with preliminary batch sheets obtained in the purchase of POC as guides. Many of the batch sheets bore the legend "Confidential." He used these to write initial drafts of procedures in the Arapahoe batch sheets. His goal was to perfect the analytical procedures contained in the original batch sheets. In connection with this goal, Novicky had possession of or access to most or all of Syntex's documents relating to the POLYCON project including the Arapahoe batch sheets and the FDA master file. He also met with Syntex's outside consultants about the project. He sought to develop procedures for commercial production of silicone monomers and silicone-containing plastics for contact lenses.

While working on these procedures, Novicky wrote weekly summaries of his work. These summaries show that Novicky worked on many aspects of the project including but not limited to polymerization conditions, control of ingredients, revision of manufacturers' specifications, purification of raw materials and intermediates, methods for casting rods, identity of various cross-linking agents,[10] distillation techniques, and purification of the T-2 monomer. He also helped develop and revise techniques to conform raw materials with FDA regulations. Although he focused on the T-2 monomer, other experiments involved substitutions of different monomers.

Novicky recorded the details of the various experiments in what became known as the Arapahoe batch sheets and the FDA master file. He worked on these batch sheets at home and at the University of Denver where he was pursuing his master's degree through Syntex's tuition assistance program.

On Friday, May 12, 1978, Novicky resigned from Arapahoe and took Arapahoe log sheets and other Syntex documents with him. Within a week, he was synthesizing the precursors to an "S-9" monomer,

---

**10.** Cross-linking agents react with large polymer molecules (macromolecules) tying the macromolecules together and giving the polymer greater strength. The strength of contact lens material is a crucial physical property since the manufacturer must be able to grind the material into contact lenses.

a monomer similar to the T–2 monomer. Then, after another week, Novicky made the S–9 monomer and polymerized it into contact lens material. He also made some POLYCON material at the same time.

The evidence is overwhelming that Novicky could not have independently developed the procedure for making a related silicone-PMMA within the time that it took him to make the S–9 material. Dr. Merker, Novicky's expert, testified that Novicky could have accomplished the reactions within two weeks if he had all the necessary background material before him. Dr. Merker and Dr. McGrath, Syntex's expert, agreed that to optimize the process as in the batch sheets, it would take about a year. Novicky himself testified that he had accumulated most of the "publicly disclosed" material that he used before he left Syntex. In fact, Novicky had incorporated much of this information into the Arapahoe batch sheets to perfect the commercial process.

Based on the complexity of the reactions, the court finds that Novicky barely had enough time to run the reactions. He had insufficient time to research and develop the process independently of his work at Syntex. He testified that he had run the reactions described by the batch sheets so many times that he was like a cook who need not consult his recipe.[11] Dr. Merker noted that substitution of the S–9 monomer for the T–2 monomer would take about a month if Novicky had the information in the batch sheets.

Between May and August, 1978, Novicky tried unsuccessfully to sell Syntex's trade secrets relating to silicone-PMMA plastics to four or five different contact lens manufacturers. He talked to Contact Lens, Ltd., Duffens Contact Lens Co., Milton Roy Co., Weslesy-Jessen Co., Palco Contact Lenses, and Breger, Mueller & Welt. Duffens Contact Lens Co. received a sample of a rod that Novicky made on May 28, 1978. Duffens, an officer of the company, said that it was the best material that he had ever seen.

After leaving Syntex and working at Pelron Corporation, Novicky learned about George Tsuetaki.[12] In August, 1978, Novicky contacted Tsuetaki about working for Tsuetaki and about selling to him technology relating to silicone-PMMA lenses. Before this contact, Tsuetaki had not manufactured or sold such lenses.

They met with Tsuetaki's patent lawyer, Mr. James FitzGibbon. Novicky wanted to work for Fused Kontacts. He showed Tsuetaki a sample polymer rod and contended that he had signed no employment agreement with Syntex and that everything was "clean." They entered into an agreement in which Novicky sold Tsuetaki, "the whole package for $20,000." Transcript, Vol. III at 26. Before the sale, Tsuetaki and FitzGibbon signed an agreement pledging confidentiality. After the sale, Tsuetaki hired Novicky and promised in the employment agreement to seek FDA approval for the material derived from Novicky's invention.

Tsuetaki and Novicky set up a laboratory for their project in Northbrook, Illinois under the name G & N Research Laboratories (G & N). Novicky worked alone and was Tsuetaki's only employee who worked on the silicone-PMMA contact lens project. Novicky and Tsuetaki decided that Novicky should prepare an FDA master file for the

---

11. During Syntex's cross-examination of Novicky, the following colloquy occurred:

Q. And you did use these batch sheets to make the rods?
A. I do not believe that I was in position that I need those batch sheets.
Q. After you ran them enough times—
A. Only percentage ingredients, that's what was important, you know, that is POLYCON.

Q. Just like a cook, once you run a recipe enough times, you don't need it in front of you, do you, Mr. Novicky?
A. Yes, all this book is cookbook, yes.
Transcript, Vol. VI at 170.

12. George Tsuetaki (Tsuetaki), originally a defendant in this action, lives in Illinois. He owns Fused Kontacts, an Illinois corporation, which was also originally a defendant, and GT Laboratories. These companies are located at 5 North Wabash, Chicago, Illinois.

S–9 polymer and final polymer rod. This master file was PX–121 at trial. The exhibit contains batch sheets corresponding to the batch sheets created by Novicky at G & N.

The S–9A monomer, which Novicky used at G & N, is related to the T–2 monomer. The structures of the two monomers differ only in the configuration of the siloxanyl groups. Instead of two methyl groups on the silicone as in T–2, S–9A has two additional siloxanyl groups. The similarity between the monomers allows Novicky to adapt the T–2 procedures and specifications to the S–9A monomer. In fact, the similarity explains how some T–2 is a side product in the reaction used to generate S–9A.

Comparison of the Arapahoe and G & N batch sheets and master files shows an undeniable overlap between the Arapahoe and G & N materials. Dr. McGrath testified that the crucial portions of the G & N and Arapahoe batch sheets are identical. For example, he found that the batch sheets and the master files included "an awful lot of very nearly identical materials" and contained "pages that [are] ... almost identical." *E.g.*, Transcript, Vol. III at 184, 187–88. Because the information in the G & N master file is so similar to that in the Arapahoe master file, the court concludes that Novicky used information from the Arapahoe file. In fact, he testified that he had all the information in the G & N master file six weeks after leaving Syntex. Since it took him much longer to develop this information while at Syntex, he could not have accumulated this information for G & N without using secrets learned while at Syntex.

The similarities show that Novicky copied the Arapahoe information verbatim. Dr. McGrath detailed "fingerprint errors"[13] in the Arapahoe sheets that carried over when Novicky copied them to the G & N letterhead. He based his comparison on these errors and the numerous details that were identical in the G & N and Arapahoe materials. Even Mr. Merker, Novicky's expert, commented that the materials "both look[ed] alike to" him. Transcript, Vol. V at 106. He noted that the highlighted sections appeared to be "identical or very similar." *Id.* at 107. Large sections of the exhibits were highlighted. Dr. McGrath observed that some minor differences between the materials reflect changes made by Novicky to account for the difference in altitude between Boulder, Colorado and Chicago, Illinois.

Thus, Novicky disclosed information to Tsuetaki from Syntex's batch sheets and master file. He admitted that the material he recopied was used by a different company for which he worked previously and that what he learned at Arapahoe was the source for the G & N batch sheets.[14] Dr. Spicer testified that Novicky admitted to him over the phone that allegations about Novicky stealing trade secrets were " 'true in part ... about five to ten percent.' " Transcript, Vol. II at 33.

Although Novicky claims that he obtained all the information in the Tsuetaki procedures from public documents, he treated the materials as trade secrets. He wrote or stamped "confidential" on the batch sheets and master file. Tsuetaki limited access to the batch sheets because he considered the information to be confidential and a trade secret. The information was stored in locked cabinets inside a locked laboratory. In letters to chemical suppliers regarding monomer precursors, Novicky required that representatives of the suppliers sign non-disclosure statements that acknowledged the proprietary

---

**13.** He referred to these errors as "fingerprint errors" because they were mistakes that a chemist would not be likely to repeat in different documents unless the chemist were copying the documents.

**14.** At the state court trial between Tsuetaki and Novicky, Novicky testified that the information in the G & N master file was "prepared prior to [his employment by Tsuetaki] ... and recopied to this letterhead." *Tsuetaki v. Novicky*, No. 80 CH 4724 (Cir.Ct. Cook Cty. Ill. Oct. 7, 1980), Transcript, at 59–60. The information was "used by different company that [Novicky] ... worked previously for." *Id.*

nature of the identity and manufacturing techniques of APMDS, a polymer precursor.

Novicky left Tsuetaki's employ in June, 1980.

### D. *Novicky's Present Activities*

Now, Novicky is manufacturing silicone-PMMA gas-permeable rigid contact lens material in Calgary, Canada and is selling the finished buttons. He uses a related monomer in the process.

## II. *Conclusions of Law*
### A. *Jurisdiction*

This court has jurisdiction over the subject matter under 28 U.S.C. § 1332.

### B. *Misappropriation of Trade Secrets*

■ Both parties agree that *Schulenburg v. Signatrol, Inc.,* 50 Ill.App.2d 402, 200 N.E.2d 615 (4th Dist.1964), *aff'd in part and rev'd in part,* 33 Ill.2d 379, 212 N.E.2d 865 (1965), *cert. denied,* 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966), describes the factors that control whether Novicky misappropriated trade secrets. This case requires proof of four elements: 1) that plaintiff had legally cognizable trade secrets, 2) that defendant obtained the trade secrets within a confidential relationship with plaintiff, 3) that defendant disclosed the secrets in breach of the confidential relationship, 4) that defendant profited from the disclosure to the detriment of plaintiff. The parties agree that Syntex did not have to introduce evidence to prove the fourth element. The court discusses the other three elements in order and finds that Syntex has trade secrets that Novicky misappropriated. A discussion of the remedy concludes the opinion.

### (1) *Existence of Trade Secrets*

■ A trade secret "is a *secret* plan or *process,* tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide in." *Schulenburg,* 33 Ill.2d at 385, 212 N.E.2d 865 (emphasis added and omitted). The evidence shows the secret nature of the information contained in the batch sheets and master file. Through employee agreements and counseling and document management, Syntex took steps to ensure that no one outside the company obtained the details of the POLYCON process. *See Affiliated Hospital Products v. Baldwin,* 57 Ill.App.3d 800, 801–02, 15 Ill.Dec. 528, 373 N.E.2d 1000 (1st Dist.1978). Even if less elaborate than on the other projects at Syntex, as contended by Novicky, Syntex's efforts to guard the POLYCON process kept the information secret except for Novicky's disclosure. *Id.*

■ The definition in *Schulenburg* clarifies that a process can be a trade secret. 33 Ill.2d at 385, 212 N.E.2d 865. This is a perfect example of such a case. *See, e.g., Imperial Chemical Industries v. National Distillers and Chemical Corporation,* 342 F.2d 737, 742–43 (2d Cir.1965) (process for manufacture of polyethylene); *Ferroline Corporation v. General Aniline & Film Corporation,* 207 F.2d 912, 921 (7th Cir. 1953), *cert. denied,* 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954) (process for production of iron carbonyl); *cf. Sikes v. McGraw-Edison,* 665 F.2d 731, 736 (5th Cir.), *cert. denied,* 458 U.S. 1108, 102 S.Ct. 3488, 73 L.Ed.2d 1369 (1982) (combination of mechanical components into grass trimmer). By running numerous experiments to optimize the product, Syntex developed detailed procedures for each step in the process of making a commercially feasible silicone-PMMA contact lens. *See, e.g., Dekar Industries v. Bissett-Berman,* 434 F.2d 1304, 1305–06 (9th Cir.1970), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971). The details ranged from the use of hexane as a solvent in a product rinse to the utility of the T–2 configuration as the predominant monomer.

Although a skilled chemist may be able to explain or recommend a particular detail of a step, the value of the secret to Syntex lay in the accumulation and integration of the various basic steps into a commercially feasible product. *See, e.g., Imperial Chemical Industries,* 342 F.2d at 742; *Ferroline,* 207 F.2d at 921. This accumulation depended in part on even the most obscure details, for example, which manufacturer

produced a sufficiently pure precursor to the final product. Everyone knows that if you mix grape juice and yeast that wine will result, but only the best vinters know the secret of what produces the best wine.

■ Novicky argues on two grounds that Syntex enjoys no proprietary interest in the process details. First, he contends that he used only information in publicly disclosed documents. This argument fails. If the information were publicly disclosed and it took Novicky only six weeks to accumulate the knowledge and run the reactions after leaving Syntex, why did it take him a year at Syntex to generate the Arapahoe procedures and master file? The court finds that, although some of the reactions are disclosed in the literature, the detailed process arose from Syntex's laboratory research and trial and error, not a literature search. Syntex has a trade secret in the overall process, not in any particular step. Even if the literature disclosed every step and reagent specification, which it does not, Syntex can protect the assembly of steps. *Compare Schulenburg*, 33 Ill.2d at 385, 212 N.E.2d 865, *with Ferroline*, 207 F.2d at 921.

■ Novicky's second argument is that he developed the procedure during his studies at the University of Denver. The court admires Novicky's efforts to earn his master's degree, but notes that he did it at Syntex's expense. The employment agreement assigned all of Novicky's ideas to Syntex. *Syntex Ophthalmics v. Novicky*, 214 U.S.P.Q. 272, 273–74, 279 (N.D.Ill. 1982), *aff'd*, 701 F.2d 677 (7th Cir.1983). The court refuses to find that everything that Novicky did twenty-four hours a day inured to Syntex's benefit, but the court concludes that, where Syntex financed his education and, by his own admission, he incorporated his University of Denver research into the batch sheets and master file, Novicky cannot contend that the Denver work was his own. *See id.*

### (2) *Novicky's Access to Trade Secrets*

Novicky's access to the Syntex information is obvious. Syntex put Novicky in charge of the POLYCON project at the beginning. Not only did he have access to the process details, but, in many cases, he developed the details for Syntex. He enjoyed freedom to review all the documents regarding the project and incorporated the information in the weekly summaries that he wrote about the project.

■ Novicky clearly received the trade secret information in confidence. He signed an employment agreement that contained explicit non-disclosure and assignment clauses. *Novicky*, 214 U.S.P.Q. at 273–74. Dr. Spicer testified that he instructed employees including Novicky that the information with which they dealt was confidential. The employment agreement is enforceable and the confidential relationship clear. *Id.*

### (3) *Novicky's Disclosure and Sale of Trade Secrets*

After leaving Syntex, Novicky used and sold confidentially disclosed information, breaching his written employment agreement with Syntex. Two weeks after leaving Syntex, he made a related material and attempted to market the product. When his solo efforts failed, he sold information to Tsuetaki for $20,000 and prepared detailed replicas of the Arapahoe batch sheets and master file for G & N. He disclosed trade secrets that he obtained at Syntex.

### C. *Scope of Relief*

#### (1) *Injunctive*

■ The most difficult aspect of this case is the scope of relief to which Syntex is entitled. It has clearly invested time and money in developing a protectible process consisting of information in the batch sheets and master file. Since leaving Syntex, Novicky has used parts of this process. Syntex is entitled at least to an order that prevents Novicky from using the Syntex process.

The problem in fashioning relief in this case arises from Syntex's agreement to not seek an injunction against use of proce-

dures within the literal terms of the Novicky patents now owned by Syntex. Because Syntex agreed to resort to its patent rights, if necessary, Novicky agreed to exclude all issues regarding development of the precursors covered by the patents. In particular, the S–9A monomer may fall within the claims of the patent.

The court's order should prevent Novicky from benefiting through his wrongdoing; therefore, the court finds that Novicky should be enjoined from using or disclosing information found solely in the Arapahoe batch sheets and the FDA master file. Under the court's order in this case, he can use, however, those procedures described by the Novicky patents or those procedures that he might develop independently of his knowledge gained from the process sheets. For example, if Syntex ever publicly discloses the information in the batch sheets and master file, Novicky can use it.

The court cannot list all the information contained in the process sheets, but it must clarify what it considers "information contained in the Arapahoe batch sheets and the FDA master file." The court prohibits Novicky from using any procedure or reaction step as it is set forth in the process sheets. For example, unless found in the patent, Novicky cannot use the specific reaction conditions, *e.g.*, temperature or pressure (or such conditions corrected for external conditions like altitude), reagents, or preparatory steps found in the batch sheets. The ban on specific reagents includes using precursors from a particular manufacturer, *e.g.*, Rohm and Haas. The ban also applies to solvents and catalysts.

Novicky's use of the S–9A monomer creates the most problems. Although this monomer may be within the literal claims of the Novicky patent, the court refuses to let Novicky use it in conjunction with *any* of the steps or reagents found in the batch sheets or master file. If the S–9A monomer is within the claims of the Novicky patents, the court believes that it is beyond the scope of this trial. *See supra* note 3. Letting Novicky use S–9A, however, in con-

junction with related steps in the batch sheets will allow him to circumvent the injunction and benefit by his wrongdoing. The similarity between T–2 and S–9A allows Novicky to adapt the batch sheets and master file information to production of a polymer made from the S–9A monomer. Therefore, Novicky cannot use S–9A with polymerization steps and reagents described by the batch sheets and master file.

The court cannot allow Novicky to extract any single step or steps from the batch sheets and adapt them to his own process unless the step or steps are publicly disclosed or are within the coverage of the patents which are not at issue here. Although the value to Syntex is in the process, any more lenient injunction would allow Novicky to get all the benefits of the process by changing trivial details of significant steps and fashioning his own process around the injunction while still drawing on Syntex's research.

 The court also concludes, however, that Novicky should be allowed to participate in the silicone-PMMA market but only if, as discussed above, he uses no information found solely in the Arapahoe batch sheets or master file. *See Affiliated Hospital Products*, 57 Ill.App.3d at 807, 15 Ill.Dec. 528, 373 N.E.2d 1000. While he might be able to compete more effectively now because of his intimate familiarity with silicone-PMMA chemistry, a former employee can always take with him the general knowledge gained while working for an employer. *E.g.*, *MBL (USA) Corporation v. Diekman*, 112 Ill.App.3d 229, 236, 67 Ill.Dec. 938, 445 N.E.2d 418 (1st Dist. 1983). Much of what he learned, *e.g.*, the contents of the Gaylord patent, was and is public knowledge that is not protectible as a trade secret. *Id.* Such knowledge is called experience and is as much the employee's property as trade secrets are the employer's property. *Id.*

For example, this court cannot take away from Novicky the knowledge that polymers made of siloxanyl alkyl methymethacrylate monomers make good contact lenses. The court can prevent him, however, from us-

ing the knowledge that for an effective precursor synthesis 3–[w] silane must be [x] pure with a boiling point of [y] and a density of [z].[14A]

▮ The duration of the injunction will be twenty years, the amount of employee time that it cost Syntex to develop the batch sheets.[15] *See Schulenburg*, 33 Ill.2d at 388, 212 N.E.2d 865. The court concludes that it cannot measure any more precisely how long it would have taken Novicky to develop the technology had he not misappropriated the trade secrets.[16] It took Syntex twenty man-years to develop the technology, so it would have taken Novicky at least that long by himself. Although Novicky might have hired others to help him with the research, this court refuses to speculate about how long it would have taken Novicky to develop the data under these circumstances.[17]

### (2) *Costs and Attorneys' Fees*

▮ With its proposed findings of fact and conclusions of law, Syntex moved for costs and attorneys' fees. The court awards Syntex costs. Under Fed.R.Civ.P. 54(d), "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Novicky has failed to provide any reason why the court should not award costs. Syntex has clearly prevailed. Novicky may object to particular costs claimed by Syntex when it presents him with a list. As a general matter, however, Syntex should receive costs.

▮ Attorneys' fees are more problematic. The court concludes that Ill.Rev. Stat. ch. 110, § 2–611 (1981) is inapplicable to this case. That section provides that "[a]llegations and denials made without reasonable cause and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by reason of the untrue pleading, together with a reasonable attorneys' fee."

In this case, the court finds that Novicky lacked an understanding of the legal significance of his actions. He has, however, made no explicit untrue statements or filed no clearly false pleadings that the court can associate with "expenses, actually incurred . . . by reason of the untrue pleadings." Novicky contended throughout trial that the Syntex information was publicly disclosed. All his pleadings and statements were made within the context of this defense. Given the facts, his legal theory was ineffective, but section 2–611 applies to lying, not faulty legal reasoning. *Knorr Brake Corporation v. Harbil*, 556 F.Supp. 484, 486–88 (N.D.Ill.1983) (finding no liability under § 2–611); *see also Szymkowski v. Szymkowski*, 104 Ill.App.3d 630, 635, 60 Ill.Dec. 310, 432 N.E.2d 1209 (1st Dist.1982) (statute is penal in nature and should be strictly construed). Although faulty, Novicky's legal theory gave him reasonable cause to contest liability.

▮ Syntex's argument under section 28 U.S.C. § 1927 is also unpersuasive. That section mandates that "[a]ny . . . per-

**14A.** The words and figures of the formula have been omitted.

**15.** Both experts testified that Novicky could optimize the process within a year given the publicly disclosed documents. This testimony related, however, to the mere laboratory production of a polymer. Syntex's investment of time and money, the fruits of which Novicky misappropriated, was much broader. For example, it encompassed commercial development and FDA approval. Syntex can protect all this information for as long as it would have taken Novicky to develop it by himself. *See infra* note 15.

**16.** The court will measure the twenty year period from the time that Novicky left Syntex. Once he left, he could have legally started to reverse engineer or, in this case, independently develop the POLYCON material. The protection of Syntex's trade secrets should only last until Novicky could reasonably have developed the process on his own. *See Schulenburg*, 33 Ill.2d at 388, 212 N.E.2d 865.

**17.** If Syntex ever publicly discloses the contents of the batch sheets or master file, then Novicky can use the information that they contain. *Schulenburg*, 33 Ill.2d at 388, 212 N.E.2d 865. The duration of the injunction depends, therefore, both on how long Syntex maintains the information as a trade secret and on how long it would have taken Novicky to independently accumulate the information. *Id.*

son admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings ... unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." It is true that Novicky was contentious at every stage of this litigation. Syntex argues, however, that Novicky's denials and stubbornness subject him to section 1927 liability.

As with section 2–611, the court concludes that Novicky's denials and stubbornness arose from his misconceptions about the validity of his legal theory and not from an unreasonable or vexatious motive. The prosecution of the case before Novicky's attorney sought leave to withdraw involved only reasonable pretrial conduct. Refusing to settle and putting Syntex and the court through a trial did multiply the proceedings. No evidence, however, supports a finding that this was unreasonable or vexatious. Although the question of liability may have been clear, Novicky was entitled to introduce evidence to guide the court about the scope of any injunction. Forcing the case to trial allowed Novicky to introduce such evidence. Given his lack of legal knowledge and legal counsel on the eve of trial, his actions were not unreasonable. *See 1507 Corporation v. Henderson,* 447 F.2d 540, 542 (7th Cir.1971).

 Section 1927 does not subject a defendant to fee liability merely because he forces the plaintiff to prove his case in court. *See Overnite Transportation v. Chicago Industrial Tire,* 697 F.2d 789, 795 (7th Cir.1983); *Colucci v. New York Times,* 533 F.Supp. 1011, 1013–14 (S.D.N.Y.1982) ("sanctions authorized under section 1927 are not to be lightly imposed; nor are they to be triggered because a lawyer vigorously and zealously pressed his client's interests"). An irrational refusal to settle is insufficient reason to saddle a defendant with fees. *Overnite Transportation,* 697 F.2d at 795; *Colucci,* 533 F.Supp. at 1014. Novicky's sincere faith in the validity of his position, although misplaced, convinced the court that he acted in good faith with no desire to abuse the legal process. *See* 697 F.2d at 795; 533 F.Supp. at 1014.

### III. *Conclusion*

For the reasons above, the court finds that defendant misappropriated trade secrets from plaintiffs. The court enjoins him from using the information described above. The injunction will last for twenty years. The court gives Syntex twenty days to propose an order that conforms with this opinion. Novicky has twenty days to respond, and Syntex has ten days to reply. Defendant will pay plaintiffs' costs.