INTERNATIONAL TELEPHONE AND
TELEGRAPH CORPORATION,
Plaintiff, Appellant,

v.

RAYCHEM CORPORATION,
Defendant, Appellee.

No. 75–1373.

United States Court of Appeals,
First Circuit.

June 25, 1976.

Certiorari Denied Oct. 12, 1976.

See 97 S.Ct. 238.

**454**

Dana M. Raymond, with whom Robert Neuner, Brumbaugh, Graves, Donohue & Raymond, John R. Hally, and Nutter, Mc-

Clennen & Fish were on brief, for appellant.

James W. Geriak, with whom Douglas E. Olson, Thomas D. Kiley, Lyon & Lyon, William Hulbert, and Fish & Richardson were on brief, for appellee.

Before COFFIN, Chief Judge, and McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Plaintiff-appellant International Telephone and Telegraph Corporation (ITT) filed this declaratory judgment action for an adjudication of invalidity and noninfringement of U.S. Patent No. 3,269,862, entitled "Crosslinked Polyvinylidene Fluoride over a Crosslinked Polyolefin", issued on August 30, 1966 in the names of Vincent K. Lanza and Edward C. Stivers (Lanza Patent). Defendant Raychem Corporation (Raychem), assignee of the Lanza Patent, counterclaimed for infringement. After a bench trial, the district court found the patent to be valid and infringed by ITT.

On appeal, ITT claims that the district court erred as a matter of law upon the issue of obviousness under 35 U.S.C. § 103, and that it made clearly erroneous findings of fact bearing upon that issue. Further, it challenges the court's determination that the patent complied with the "best mode" disclosure requirement under 35 U.S.C. § 112. The final issue is whether the district court erred in finding that the patentees had not committed fraud by failing to disclose information to the Patent Office.

The patent in suit describes a wire insulation composed of a primary layer of a crosslinked polyolefin, such as crosslinked polyethylene, and a secondary, outer layer of crosslinked polyvinylidene fluoride (referred to hereinafter by its trade name, Kynar).[1] The wire insulation claimed in the patent

---

1. Some technical terms must be defined:

A polymer is a chemical compound, or mixture of chemical compounds, which consists essentially of repeated structural units. The individual units are called "monomers". Polyethylene, for example, is a chain of successive ethylene, $CH_2$, units. Polyvinylidene fluoride is a chain of vinylidene fluoride, $CF_2$ $-CH_2$, units.

Polyolefin is a generic term for polymers made from certain types of organic compounds—hydrocarbon chemicals. Polyethylene is a polyolefin.

may contain antimony oxide in the polyethylene layer. Wire constructed within the claims of the patent is particularly suitable for use on high performance jet aircraft to carry electricity to various parts of the airplane, and to transmit electronic signals for the extensive electronic equipment used on the plane. This wire has been qualified for Defense Department aircraft under Military Specification Mil–W–81044. Accordingly, it is referred to in the trade as 44 wire.

Military specifications are prepared by the government in consultation with the contractors who build the aircraft. The specifications set forth a number of performance characteristics in addition to electrical insulation. A wire must satisfy each of the performance standards before it can be used pursuant to the specification. The characteristics needed for aircraft wire include: (1) low flammability; (2) solvent resistance (so that gas leaks will not degrade the wire); (3) abrasion resistance; (4) flexibility; (5) processability (capacity of a wire to be stripped, marked or sealed); and (6) notch insensitivity (capacity of a wire to be nicked and bent without cutting through the entire depth of insulation). Two other characteristics are of particular importance to this case: low weight and a specified "temperature rating", i. e., the highest temperature at which a wire has a useful service life of 10,000 hours. For each of the foregoing characteristics, tests have been devised which indicate the wire's standard of performance. A military specification will list the standards of performance necessary to qualify a wire under it.

The wire described in the patent in suit was developed for use in the F–111 fighter plane. General Dynamics, the contractor in charge of the Air Force version of that plane, initiated a search for a light weight, medium temperature rated aircraft wire. In response, Raychem began experimenta-

tion with a number of possible wire constructions. The types of constructions it attempted, however, were limited by the technology in which the company specialized. The principal technology of Raychem (the name is a contraction of Radiation Chemistry) is the combination of advanced polymeric and radiation techniques.

There was testimony before the district court establishing that there were between 50 and 75 polymeric materials available as insulating material for wire. Raychem had previously produced insulation using polyethylene, a material known to have good electrical insulation properties. However, polyethylene had a low temperature rating, poor solvent resistance, and a number of other undesirable characteristics. As was well known in the trade, these properties could be improved by placing a secondary or outer layer of insulation over the polyethylene. But there was no universal material which was good for all the desired characteristics of acceptable airplane wire. Further, interactions between the materials made prediction of the characteristics of a combined insulation difficult. For example, Raychem had previously experimented with a Teflon protective layer over polyethylene. This insulation burst when internal pyrolysis of the polyethylene emitted gasses which could not escape through the Teflon. In developing the wire in suit for General Dynamics, Raychem considered thick-walled crosslinked polyethylene, polyethylene with glass fillers, crosslinked Kyner over polyethylene, fluorinated theylene propylene rubber over crosslinked polyethylene, Kynar over polyvinylchoride and others.

Of the materials tried, the crosslinked Kynar over crosslinked polyethylene combination was the only one to give any indication of satisfying the General Dynamics requirements. Tests were performed to determine whether that wire construction could meet all the proposed standards. The

Crosslinkages between individual polymeric chains impart greater form stability to the plastic. Crosslinkages are created by bombarding the plastic with electrons, subjecting it to irradiation, or, with some materials, vulcanizing it.

Thus, crosslinked polyolefins are a group of polymers of certain hydrocarbons which have been processed to achieve greater form stability.

district court found that these tests had ,some unexpected and surprising results. First, the test for a temperature rating resulted in an unprecedented phenomenon. Because testing a wire for 10,000 hours would be prohibitively time consuming, the government developed, and the industry used, a short period-high temperature test to predict a temperature rating for 10,000 hours. The actual measurements would be plotted on a graph, and a straight line extended from the plots to determine the temperature at which the wire would have a service life of 10,000 hours. Under the initial tests there were indications that crosslinked Kynar over crosslinked polyethylene would fail to meet the required 135°C temperature rating. Further testing, however, showed that the graph of the time-temperature results had a dog-leg. This dog-leg raised the prediction of the temperature at which the wire would have a service life of 10,000 hours, to 135°C.

The addition of antimony oxide to the polyethylene layer resulted in another surprise. That construction met the ash formation requirement of the flammability test which General Dynamics set down for the replacement wire, and was exceptionally flame retarding. Antimony oxide had not been previously used alone as a flame retardant, although it had been used in combination with other additives. To account for this unexpected performance, Raychem proposed a theory in its patent application that the Kynar outer layer provided an oxygen barrier. This theory has since been discarded. Raychem now suggests that a chemical combination occurs between the antimony oxide and the hydrogen fluoride that is released from the Kynar when the wire is subject to heat. The resulting antimony fluoride compounds, Raychem claims, are flame retardants.

Raychem proposed the wire to General Dynamics, and after further testing it was accepted under Mil–W–81044 for use on the

F–111 aircraft. It subsequently was used on the Boeing 747 and the C5A. In August, 1966, the Patent Office issued the patent in suit. The Defense Department obtained from Raychem a royalty free license for wire procured from any source. Consequently, the wire used on government aircraft is not involved in this suit. ITT's Suprenant Division, however, sold 44 wire to commercial users without authorization as well as to the government under the royalty free license. ITT's actions led to a charge of infringement, which is not actually contested, and to this suit.

## I. Obviousness

▮ In order for a claimed invention to be patentable it must not be obvious to one of ordinary skill in the art to which the invention pertains.[2] The Supreme Court has defined a court's task in evaluating a charge of obviousness as follows:

"While the ultimate question of patent invalidity is one of law, . . . the § 103 condition, which is one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

Accordingly, this court has often stated that the determination of obviousness, although within limits a question of law, is essentially one of fact. *Forbro Design Corp. v. Raytheon Co.*, 532 F.2d 758, at 763 (1st Cir., Mar. 22, 1976); *Shanklin Corp. v. Springfield Photo Mount Co.*, 521 F.2d 609, 616 (1st Cir. 1975); *Koppers Co. v. Foster*

---

2. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . . . ." 35 U.S.C. § 103.

Grant Co., 396 F.2d 370, 372 (1st Cir. 1968). ITT contends that the claims in the Lanza Patent are obvious as a matter of law. It asserts that the new insulation is merely a combination of known materials, put together in a known pattern, which exhibits predictable characteristics. Although many patents covering new combinations of old materials have been invalidated for obviousness, e. g., Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950)[3]; Dale Electronics, Inc. v. R.C.L. Electronics, Inc., 488 F.2d 382 (1st Cir. 1973), such new combination inventions are not inherently unpatentable. See United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1965). The relevant legal standard is sometimes defined as whether the new combination "result[s] in an effect greater than the sum of several effects taken separately." Anderson's-Black Rock, Inc. v. Pavement Salvage Co., supra, 396 U.S. at 61, 90 S.Ct. at 308, quoted in Sakraida v. Ag Pro, Inc., —— U.S. ——, ——, 96 S.Ct. 1532, 47 L.Ed.2d 784, 44 U.S.L.W. 4477, 4480 (April 20, 1976).

■ Based on the district court's findings of fact, we hold that the invention claimed is patentable under this standard. The court found that the temperature rating of the wire insulation was "unpredictably high" as compared to the temperature ratings of its components. Also, as noted above, the wire insulation was unexpectedly flame resistant. Thus, the findings establish a sufficient "synergistic" effect between the materials in the new combination, to cross the legal border line from a combination which produces a "more striking result" to one which constitutes a patentable invention. See Sakraida v. Ag Pro, Inc., supra, at ——, 96 S.Ct. 1532.

ITT's contentions concerning obviousness thus resolve themselves into claims that the district court's findings were clearly erroneous. See Forbro Design Corp. v. Raytheon Co., supra, at 9; Fed.R.Civ.P. 52(a). We have carefully reviewed the appendix supplied by the parties and have discovered no finding of fact which leaves us with the "firm conviction that a mistake has been [made]." United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

In general, ITT objects to the district court's findings that the test results were unexpected and surprising, and that experts in the field, including ITT employees, showed skepticism that the wire could perform as described. The various findings, claimed to be erroneous, including the findings of unexpected ash formation, temperature rating, and exceptional flame resistance, are all supported by testimony and exhibits in the record. Although the supporting evidence was controverted by ITT's experts, we cannot say the findings are clearly erroneous.

The second category of asserted errors of fact concerns the district court's rejection of four specified prior publications as rendering the Lanza claims obvious. Two of these publications—the Mathes Patent, U.S. Patent No. 2,929,744, and the British Patent No. 860,811—are of limited relevancy to the claims in the Lanza Patent. The Mathes Patent claims an insulation consisting of an inner layer of irradiated polyethylene and an outer layer of resinous material, i. e., varnish, as well as a process of preventing deterioration of polyethylene by covering it with a layer of resin material. The district court found that, apart from teaching double walled construction, a practice known from the 1930's, the patent did not suggest the wire insulation in the Lanza Patent. Varnish has little resemblance to Kynar: the effect of the Mathes patent is due to the low oxygen permeability of varnish when subjected to heat; Kynar, on the other hand, increases in oxygen permeability

---

**3.** The patent in this case was invalidated for "lack of invention". Section 103 was not enacted until 1952.

when heat is applied.[4] The British patent claims a process of creating thick-walled crosslinked polyethylene insulation by applying multiple thin layers and bombarding the layers with electrons. The patent also indicated that an outer layer of neoprene rubber could be applied. This is primarily a process patent which covers the problem of crosslinking a thick wall of polyethylene insulation by bombardment with high energy electrons.[5] The district court found that the British patent had no relevance except as to reaching the use of crosslinked polyethylene as an insulation material. We have no trouble in finding that the district court did not commit clear error in regard to these two patents.

The other two publications cited by ITT hold much greater relevance to the claims in the Lanza Patent. One is a fourteen page brochure, used to promote Kynar by its manufacturer, Pennsalt Corporation. The brochure discusses Kynar's key properties, the forms in which it can be used, its applications, and methods of fabricating it. ITT claims that the brochure is relevant to the subject matter of the Lanza Patent because it suggests the use of Kynar as a wire insulation material and it describes Kynar as having several desirable qualities for secondary insulation: toughness, flame resistance, and thermal stability. Among over a dozen illustrative uses, ranging from "heavy walled unsupported pipes" to "sterlizable packaging", is its use for "extruded jackets and prime insulation for high temperature wire insulation." Subsequently, the brochure notes that Kynar was undergoing "long term field tests" for many applications, one of which was described thusly: "in primary insulation and in jackets for

multiconductor cables, KYNAR has performed successfully at temperatures from —80° to 300°F'". There was, however, as the district court noted, no indication that Kynar should be crosslinked or that it should be used in combination with other materials. The court was supported in its reading of the suggested uses as confined to primary single layer wire insulation and jacketing for multi-conductor cables rather than its use as part of a two layer insulation.

The district court did not discuss the disclosure of the properties of Kynar contained in the brochure. But, contrary to ITT's claims, we cannot see how the description of the properties of Kynar renders the claims in the Lanza Patent obvious. The district court found, and there is ample evidence to support this finding, that the performance characteristics of 44 wire were unexpectedly superior to that predicted by its composition. We can see, with the benefit of hindsight, how the brochure, if read imaginatively, would suggest to one skilled in the art that Kynar would be a good material to experiment with. But how to use it, in what structure and combination and for what precise product would have been made no more obvious than the teaching of the advertisements in *Abington Textile Machinery Works v. Carding Specialists (Can.) Ltd.*, 249 F.Supp. 823, 833 (D.D.C. 1965).

■ The final example of prior art cited by ITT is the Timmerman patent which teaches the characteristics of irradiated or crosslinked Kynar.[6] In example II of the patent, a crosslinked Kynar insulation was reported to have a one hour life at 200°C. Because the standard of performance under

---

4. Varnish, a thermosetting material, does not soften and flow when heat is applied. Kynar is a thermoplastic material; it softens when heat is applied, and its oxygen permeability is thereby increased.

5. X-rays and Gamma rays are very penetrating and can produce the desired structural changes of crosslinkages in the polyethylene to a considerable depth. In contrast, electrons have a reduced penetrating power. The British patent describes a process to manufacture a thick-

walled insulation by layering and bombarding each polyethylene layer separately.

6. The Timmerman patent, U.S. Patent No. 3,142,629, was cited by the patent examiner. At trial ITT asserted that Raychem had violated its duty of full disclosure of prior art to the Patent Office in failing to cite the other three publications. The district court found that Raychem had fulfilled its duty. Therefore, the presumption of validity of the patent was unimpaired. 35 U.S.C. § 282.

the specifications for 44 wire is 120 hours at 200°C (to obtain a 10,000 hour 135°C rating), the district court found that the Timmerman patent taught away from using Kynar to insulate wires for high performance aircraft. ITT suggests that the district court misinterpreted the teaching of the Timmerman patent. The patent as a whole teaches the superior performance of crosslinked Kynar. The one hour life at 200°C reported in the patent was not the same measurement as the life cycle tests required by Mil–W–81044. But the record does not disclose the differences between the Timmerman test and the military specification test. Nor does the record show exactly what the Timmerman report of the one hour life at 200°C would mean to a scientist in relation to the performance of crosslinked Kynar under the life cycle, specification tests. We, therefore, on the record below, cannot set aside as clearly erroneous the district court's finding that the Timmerman patent would have led one away from the use of crosslinked Kynar for high performance aircraft wire.

 Finally, the court below found that 44 wire enjoyed wide commercial success and filled a demonstrated need. While such criteria cannot salvage otherwise obvious patent claims, they may be considered in a close case. *Graham v. John Deere Co., supra*, 383 U.S. at 17, 86 S.Ct. 684; *Potter Instrument Co. v. ODEC Computer Systems, Inc.*, 499 F.2d 209, 211 (1st Cir. 1974).

This case presented such a close question of obviousness in the context of a combination patent. In such circumstances, the claims of the patent should be rigorously examined. *Sakraida v. Ag Pro, Inc., supra.* We are mindful, however, that ITT had the burden of persuasion both as plaintiff and as the opponent of the presumption of validity, 35 U.S.C. § 282, which attaches to issued patents. Because the claims of the Lanza Patent cannot be held obvious as a matter of law, and the district court's findings of fact were not clearly erroneous, we affirm its judgment that the patent was not obvious.[7]

## II. The "Best Mode" Issue

ITT's second claim against the patent is that the patent failed to comply with the disclosure provision of 35 U.S.C. § 112, concerning the "best mode" to reproduce the invention. In particular, ITT claims that the patent does not disclose the precise chemical formulations which Raychem used to produce its commercial 44 wire. Example 1 of the patent, ITT states, does not show the use of two copolymers[8] in the polyethylene layer of the wire insulation. Nor did Raychem disclose the formula of a secret, proprietary compound, known to this litigation as Compound X, which is added to the Kynar layer in its commercial wire. Raychem, however, claimed that the omission of these details of its commercial operation did violate the "best mode" require-

---

7. In a recent case, *Deering Milliken Research Group v. Beaunit Corp.*, No. 74–2233 (4th Cir. 1976), Mr. Justice Clark wrote: "[t]he alleged infringer, Beaunit, had the burden of proving that the patent, presumed to be valid, did not meet the statutory requirements of validity . . . ." The district court's decision that the 'wrap around' feature of Lesley's invention was nonobvious under § 103 was a determination, as a question of law, that Beaunit had not met its burden. Thus, we are free to disagree with the district court even if we cannot brand his conclusion on the issue of obviousness clearly erroneous." Slip op. at 6. We note, however, that the opinion goes on to establish that the infringer had conclusively shown that a prior patent had disclosed the purported invention. It concludes with the holding that the trial court's contrary finding was "clearly erroneous". Therefore, we are not persuaded that a

different standard of review than the one indicated in the text exists for issues of obviousness.

8. The testimony before the district court established the following definitions:

 "the word 'homopolymer' defines a polymer made from one single monomer, such as polyvinylidene fluoride alone, and the word 'copolymer' describes the polymer made from a mixture of different monomers."

 Many copolymers which have a relatively large amount of one monomer, and a minor amount of a second monomer are referred to as homopolymers of the dominant monomer of the mixture. Thus the word "polyethylene" could describe a copolymer consisting primarily of ethylene but with minor amounts of another monomer.

ment of 35 U.S.C. § 112. The copolymers and Compound X were not used to change the qualities of the finished product, but to aid in the extrusion [9] of the plastics during the manufacturing process.

The district court agreed with Raychem. In regard to the copolymers, it found that they were well known in the trade, and were not part of the claim in the Lanza Patent. Compound X was found to have no effect on the qualities of the finished 44 wire, and to relate only to the manufacturing process utilized by Raychem. Accordingly, it rejected the "best mode" challenge to the patent.

Section 112 requires that a patent "set forth the best mode contemplated by the inventor of carrying out his invention." An adequate disclosure is one which enables "one skilled in the art [to practice the invention]." *Universal Oil Co. v. Globe Co.,* 322 U.S. 471, 484, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399 (1944); *see Illinois Toolworks, Inc. v. Solo Cup Co.,* 179 U.S.P.Q. 322, 366–69 (N.D.Ill.1973). This court has articulated the requirement imposed by § 112 as disclosure of "specific material which will make possible the successful reproduction of the effects claimed by the patent." *Dale Electronics, Inc. v. R.C.L. Electronics, Inc., supra,* at 389.

■ As the invention in the Lanza Patent concerns the combination of a crosslinked polyolefin (polyethylene in Example 1) covered with crosslinked Kynar as a wire insulation, the specifications required to be disclosed are those which permit the insulation to be copied with success. As the district court found that the unrevealed copolymers of the polyethylene were well known to the trade, and this finding is not clearly erroneous, the disclosure in Example 1 that the inner layer of the insulation should be comprised of crosslinked polyethylene was sufficient. *See Application of*

*Gay,* 309 F.2d 769, 773, 50 C.C.P.A. 725 (1962).

■ ITT's contentions concerning the mysterious Compound X, while initially more disturbing, also lack merit. The Lanza Patent covers a product, 44 wire; it does not make any claim to the process of manufacturing that product. The district court found that the addition of Compound X had no effect on the qualities of the finished insulated wire. Moreover, its addition to the Kynar was not crucial to the manufacturing process, but merely made the production of 44 wire more profitable by allowing the Kynar to be extruded over the wire at a faster rate. That Compound X is not essential to the production of the patented wire distinguishes this case from *Flick-Reedy Corp. v. Hydro-Line Mfg. Co.,* 351 F.2d 546, 550–51 (7th Cir. 1965), which invalidated a product patent for failure to disclose the specifications of a "special tool" essential to the successful reproduction of the product. *See generally, Illinois Toolworks, Inc. v. Solo Cup Co., supra,* at 367. Thus, we agree with the district court that information concerning Compound X was not required to be disclosed in order to satisfy § 112 requirements.

III. Fraud

■ ITT contends that the district court erred in not finding the Lanza Patent to be procured by fraud and either invalid or unenforceable. In support of this assertion, appellant states that Raychem failed to comply with its duty of full and frank disclosure to the Patent Office in that it (1) failed to cite relevant prior art; (2) misrepresented the results of tests; (3) withheld negative or neutral results of tests while reporting positive results; and (4) inadequately informed the Patent Office of preexisting types of aircraft wire. The district court found the omitted prior art cited by ITT largely irrelevant to the patent in

---

**9.** From the testimony at trial, a definition of extrusion:

"This is a process for making useful articles out of polymers in which a machine called an 'extruder' is very much like an oversized, heated meat grinder. At one end of the machine the polymer, in the form of small cubes, perhaps an eighth of an inch, is placed on the side and heat then melts these cubes and, as the screw of the machine is turned, the material . . . comes out much like toothpaste out of a tube."

suit, the omitted test results irrelevant to the claims in the patent, and the disclosure of earlier types of aircraft wire adequate. It did not specifically address ITT's claim that Raychem misrepresented test results by stating that they were made in accordance with the construction specified in the example while, in actuality, they were of Raychem's commercial wire. This argument, however, is merely a restatement of ITT's claim that Raychem failed to reveal the "best mode" of making the wire. As the district court resolved this issue against ITT, supportably in our view, we see no merit in ITT's claim here. Finally, the district court found that Raychem had "dealt with the Patent Office in candor and good faith."

█ These findings are of fact, and, upon review, are not clearly erroneous. *See Cataphote Corp. v. Desoto,* 450 F.2d 769, 772 (9th Cir. 1971). The finding of good faith on the part of Raychem completely undermines any contention that the patent should be declared invalid or unenforceable because of failure to disclose information to the Patent Office. Although the law is not free from doubt, courts considering allegations of fraud in procurement of a patent have held that some element of wrongful conduct—intentional misrepresentation or inequitable, reckless, or grossly negligent conduct—is a necessary predicate to rendering a patent unenforceable in the courts. *See In re Multidistrict Litigation Involving Frost Patent,* 398 F.Supp. 1353, 1365–70 (D.Del.1975). Recently, in this circuit, we considered a case in which the district court found a patent partially unenforceable for conduct characterized as "affirmatively deceptive". *Norton Co. v. Carborundum Co.,* 397 F.Supp. 639 (D.Mass.1975), *aff'd on other grounds,* Nos. 75–1309-10 (Feb. 1976). This court has not defined the exact standard of wrongful conduct that would disable an otherwise valid patent from en-

forcement. *See Norton Co. v. Carborundum Co.,* 530 F.2d 435 at 439 n. 11. We decline to do so here, for ITT, aside from its allegations of fraud, has failed to establish any wrongful conduct on the part of Raychem.[10] In these circumstances, the district court properly found ITT's allegations of fraud in the procurement to be without merit.

*The judgment of the district court is affirmed.*

---

10. ITT protests the district court's suggestion that it should have called the patent examiner to testify concerning the relevancy of the omitted prior art. The company claims that the examiner could not have testified to matters of opinion or speculation. This would seem to be a correct statement of the law. *Standard Packaging Corp. v. Curwood, Inc.,* 365 F.Supp. 134, 136–38 (N.D.Ill.1973). The district court's suggestion, however, was in relation to ITT's complete failure to present evidence of fraudulent misconduct.