Charles S. CHRISTIANSON and
International Trade Services,
Inc., Plaintiffs,

v.

COLT INDUSTRIES OPERATING
CORP., Defendant.

No. 84–4056.

United States District Court,
C.D. Illinois.

May 24, 1985.

Stuart R. Lefstein, Rock Island, Ill., John C. McNett, Indianapolis, Ind., Richard I. Fine, Los Angeles, Cal., for plaintiffs.

Anthony M. Radice, Joseph C. Markowitz, Kim J. Landsman, New York City, N.Y., John V. Patton and James D. Mowen, Moline, Ill., Robert L. Harmon, Chicago, Ill., for defendant.

## MEMORANDUM DECISION AND ORDER

ROBERT D. MORGAN, District Judge.

Plaintiffs, Charles R. Christianson and essentially his corporation, filed this complaint against Colt for damages, injunctive and equitable relief, under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), upon their allegations that Colt has violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Colt has answered denying violation and asserting numerous affirmative defenses and counterclaims. Venue exists in this district under 15 U.S.C. § 15 and 28 U.S.C. § 1391(b) and (c).

The complaint is grounded on allegations that Colt achieved and now attempts to maintain an unlawful monopoly on the manufacture and sale of parts for the M–16 standard military rifle. In the 1950's Colt obtained a patent for a gas-operated, automatic rifle which was adopted in 1964 by the United States as its standard military firearm. The Government designated it as

the M–16. In ensuing years, Colt obtained several other patents on improvements of parts for that weapon. With a few exceptions, not critical to this decision, all such patents have now expired. Over the years, Colt entered into a licensing agreement with the Government for Government production of the M–16 for its use and for sale to foreign governments under the patents and drawings and technical data supplied by Colt. It also entered into agreements with the government of the Philippines, and with certain other foreign governments, authorizing the manufacture of the rifles to arm each such nation's military forces. It further entered into contracts with various suppliers in the United States for the manufacture and sale of component parts for the rifle. Those licenses restricted the sale of such parts to Colt and the United States Government only. With each such agreement, defendant supplied drawings and technical data for use by the various licensees. All agreements contained restrictive clauses which prohibited the sale of parts to all except the authorized clients, and which prohibited the disclosure of defendant's drawings and technical data to anyone not specifically authorized by the agreement to see them. As to domestic licenses, the proscription excluded only defendant and the Government. The proscription in the foreign licenses limited sale to each nation's own military force and disclosure only to appropriate government officials. The complaint alleges that Colt has employed those restrictive clauses in an attempt to deny to any others the right to manufacture such rifles and parts notwithstanding the fact that Colt's patents have been expired for several years. It is alleged that Colt attempts, by such practices, to foster and maintain its monopoly position in the manufacture and merchandising of the products as if its patents still remained in force.

In 1983, Colt filed in this court a suit against Springfield Armory, Inc., and others, under docket no. 83–4072, to enjoin the performance of a contract of those named defendants for the sale of M–16-type rifles to a Central American government. A pre-liminary injunction was issued following a hearing. These plaintiffs were ultimately joined, and that decision was affirmed by the Court of Appeals for the Federal Circuit. Further discussion of the latter decision appears in a later context. The ground for complaint in that case was that Colt would be irreparably damaged by the unauthorized use of Colt's drawings and proprietary information which Colt claimed were trade secrets and its exclusive property. That case has heretofore been settled by the parties and closed.

Plaintiffs filed the pending complaint against Colt in 1984. The cause was scheduled for trial late in that year. That schedule was cancelled on the representation by the parties that cross motions for summary judgment would be filed. Those motions are now before the court for decision.

The thrust of plaintiffs' motion is the position that Colt cannot assert its claims of trade secrecy against plaintiffs because it had, in its now-expired patents, failed to make the full disclosures of its claims of invention as required by 35 U.S.C. § 112.

Plaintiff Christianson has been marketing M–16 components for approximately eight years. Initially, Colt acquiesced to his use of drawings obtained from a Colt foreign licensee. It also appears that during that period other suppliers advertised for the sale of M–16 parts, as well as some M–16 drawings. It further appears that significant M–16 manufacturing not authorized by Colt licenses was conducted by Colt's foreign licensees and domestic suppliers, all without serious objection from Colt. Plaintiffs argue, not implausibly, that Colt was not concerned with such activities so long as its U.S. position was protected by its basic patents. Plaintiffs assert that Colt resorted to legal action to try to restore its monopoly position only after its basic patents had expired.

A critical factor here clearly is the unique character of the product involved. A key criterion of a military weapon is that there be complete interchangeability of parts between all weapons of the same

general kind which have ever been produced for use by a military force. Critical to that requirement is the ability to scavenge weapons from a battlefield for parts replacement in all other like weapons. That critical factor was emphasized by Colt before this court in the hearing for a preliminary injunction in the *Springfield* case. Colt took the position that the M–16 had an absolutely essential feature of parts interchangeability which was critical to the use of the rifle on the battlefield, and that that feature could be satisfied only by the use of Colt's drawings and trade secrets. It asserted that the M–16 was not reverse enginerable. In that context plaintiffs assert:

> "Thus [Colt] avoided *Syntex Ophthalmics, Inc. v. Novicky*, 591 F.Supp. 28, 221 U.S.P.Q. 860 (N.D.Ill.1983), *aff'd* 28 Pat. Trademark and Copyright J. (BNA) 717 (Fed.Cir.1984), and cases before it, which stand for the proposition that if a product is reverse enginerable, injunctive relief against theft of trade secrets is limited in time. Thus, to extend its exclusive position well beyond the expiration of its patents, Colt had to argue that the M–16 was not reverse enginerable."

To a degree, as plaintiffs argue, Section 112 places Colt on the horns of a dilemma. To sustain its claim for an injunction in case 83–4072, Colt had to take the position that interchangeability of parts was a must, and that such interchangeability could be fully obtained only by the use of Colt's drawings and other claimed trade secrets. In that context, a Colt expert testified that it would be possible from the base patents for a person skilled in the art to make a rifle similar to that claimed by the patent and by use of reverse engineering of a Colt firearm, but that would be a "massive" task. In the context of these motions, that same expert has executed an affidavit which asserts that the making of an M–16, using the patents by a person skilled in the art, would not entail undue experimentation.

A review of *Colt Industries Operating Corp. v. Springfield Armory, Inc., et al.,* (Fed.Cir., April 19, 1984, unpublished), in which this court's issuance of a preliminary injunction was affirmed, seems appropriate in this context. The single issue before that court was the appropriateness of the preliminary injunction upon the record made in that hearing. It did affirm the judgment of this court. Pertinent to these motions now, the there court said:

> "Although Springfield's 35 USC 112 arguments, particularly related to best mode, have an appearance of validity (*See White Consolidated Industries, Inc. v. Vega Servo-Control, Inc.*, 713 F.2d 788, * * * (Fed.Cir.1983), the evidence of record is totally lacking in specifics. * * * "

Although obviously that statement cannot be read as a predetermination by the Federal Circuit of the issues now before this court, it can and should be accepted as the statement of a recognition by that court that possibly serious issues of Colt's compliance with Section 112 could exist, subject to substantiation by adequate evidence. To that extent, and to that extent only, that statement does have a bearing on the issues now before this court.

The crux of the issues presented by these motions is the language of 35 U.S.C. § 112, which provides that a patent to be valid must:

> " * * * contain a written description of the invention, and of the manner and process of making it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

*In re Gay*, 309 F.2d 769, 50 C.C.P.A. 725 (1962), said that Section 112 imposed both an enabling requirement and a best mode requirement to sustain the validity of a patent. The court there said that the enabling requirement was designed to ensure that the printed patent disclose an invention in sufficient detail to enable persons skilled in the art to make and utilize the

invention, and that the best mode requirement was designed to preclude inventors from applying for patents while at the same time concealing from the public the preferred embodiment of the inventive concept. The "enablement" requirement of the statute is satisfied if a person of ordinary skill in the art is able to make and use, without undue experimentation, a functioning version of the invention from the disclosures of the patent coupled with information which is already publicly known. *White Consolidated Industries, Inc., v. Vega Servo-Control, Inc.,* 713 F.2d 788 (Fed.Cir.1983).

Thus Section 112 provides the quid pro quo for the grant of a patent monopoly under the Act. The Patent Act was designed to foster and enhance the development and disclosure of new ideas and the technical advancement of knowledge. Upon a determination that a patent claim does contain the elements of inventive novelty, the claimant becomes entitled to a monopoly on the right to practice and exploit the patented invention for a substantial but limited period of time. At the same time, the issued patent becomes a part of the public domain, subject only to the patentee's exclusive right to exploit the patented invention as defined by him during the limited monopoly period. Others are free during the period of that monopoly to devise improvements upon the patented concept, without redress to the patentee, so long as those improvements do advance the state of the art and public knowledge. Yet the patentee can assert his monopoly rights against those who adopt only superficial modifications which fall short of a true advancement of the art. In exchange for his limited monopoly position, the patentee must disclose in his patent sufficient information to enable others skilled in the art to employ and profit from the invention after the period of limited monopoly has expired. Section 112 simply delineates the scope of the disclosures which are necessary to accomplish and protect those public purposes by requiring that the patent applicant fully describe the subject matter as to which he is asserting a claim to a statutory right to a monopoly.

## CONCLUSION

It is necessary here to conclude, from the voluminous exhibits, pertinent patents, affidavits, depositions and other materials submitted to the court, and in keeping with the patent concept, that plaintiffs are entitled to judgment in their favor. The disclosures made by Colt in obtaining its patents satisfied neither the enablement nor best mode requirements of 35 U.S.C. § 112.

## DISCUSSION

■ The enablement requirement is fulfilled if a person of ordinary skill in the art is able, without undue experimentation, to make and use some mode of the invention from the disclosures of the patent and from what was previously publicly known. *White, supra; Engelhard Industries, Inc. v. Sel-Rex Corp.,* 253 F.Supp. 832 (D.N.J. 1966), aff'd 384 F.2d 877 (3d Cir.1967). *Engelhard* points up the distinction between enablement and best mode by its holding that the enabling requirement was satisfied, but that there had been a failure to disclose the best mode for carrying out the invention.

To a large degree, Colt, in opposition to the plaintiffs' motion, has attempted to create a question of fact from conflicting sworn statements of its own expert witnesses. It employed a Seth Bredbury who now states in his affidavit as to the bolt assist patent (No. 3,236,155) that a person of ordinary skill in the firearms art could design and produce a gas-operated firearm of the type shown, incorporating the invention defined in the patent, without undue experimentation. Yet, Mr. Bredbury, in his prior testimony based upon his review of the Colt patents, stated that a person skilled in the art could design a rifle very much like the M-16, which could perhaps function as well, but that that would be a massive undertaking. While he did not define the word "massive," it must be recognized that that term means unusually large, or, as defined in Webster's New Col-

legiate Dictionary, "large in comparison to what is typical." The use of the word "massive" must imply the use of undue experimentation before any practical result could be achieved.

Harold Waterman, the head of Colt's firearm product engineering, testified, in reviewing the same bolt assist patent, that "you could not" make a weapon by the use of that patent. "You could get an idea of the mechanism, and that would just about be it." The question presumed a person skilled in the field of manufacturing firearms who had available all tools and equipment for firearms manufacture, but not including any gauges in which Colt claims a proprietary interest as trade secrets.

■ Mr. Bredbury's current statement that no "undue experimentation" would be required is not substantiated by any statement of fact. There is no evidence that any weapon other than the Colt weapons could or do use any of the inventions. It seems both reasonable and unavoidable to presume that those skilled in the art would have devised a weapon to compete with the Colt product in the 20 years elapsed since the M–16 became the adopted weapon of the United States military, if a comparable weapon could be made without undue experimentation and without access to Colt drawings and technical information. The bare statement of the conclusion that it could, without any factual substantiation, cannot create an issue of fact. The question of enablement has been held to be a question of law. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 960 (Fed.Cir.1983). An issue of fact is not created by the statement of an unsubstantiated legal conclusion. *E.g., Application of Brandstadter*, 484 F.2d 1395 (CCPA 1973).

■ Consideration of the best mode requirement of § 112 should begin with the distinction between the two requirements of the statute. The enablement requirement is designed to allow the public to practice the invention in a generalized fashion. The concern of the best mode requirement is the prevention of abuse of the patent monopoly by its extension beyond

the limited period which the statute permits. *In re Gay, supra.* Failure of disclosure of the best mode for practicing the invention could have that effect when the patentee fails to disclose essential information. Upon expiration of the limited patent monopoly, the public is entitled to practice the invention without restriction, including the right to produce and market the patentee's commercial product without modification. The patent statute contemplates that, in exchange for the grant of a limited monopoly, the patentee will make a full disclosure of the patented idea to such extent that it may be fully utilized by those skilled in the art once the patent monopoly has expired. Whether or not the best mode contemplated by the inventor for carrying out his invention was disclosed, is a question of fact. *McGill Incorporated v. John Zink Company*, 736 F.2d 666, 673, 221 U.S.P.Q. 944, 951 (Fed.Cir.1984).

■ The disclosures required by § 112 can impose a burdensome task on both the patent applicant and the patent examiner, but that does not excuse, as Colt tends to argue, the necessity for disclosure of whatever information is required to satisfy the statutory command. A party is free to disclose whatever it wishes and in any suitable manner, provided that the disclosures made are sufficient to satisfy the statutory requirement. *Weil v. Freitz, Evans and Cooke*, 202 U.S.P.Q. 447, 450 (CCPA 1979). The courts must be vigilant, in consideration of § 112 issues, against the, perhaps natural, desire of patentees to disclose as little as possible. *Flick-Reedy Corp. v. Hydro-Line Mfg. Co.*, 351 F.2d 546, 550–51 (7th Cir.1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301. Satisfaction of § 112 may require voluminous disclosures as demonstrated in *Honeywell, Inc. v. Sperry Rand Corp.*, 180 U.S.P.Q. 673 (D.Minn.1973), in which a computer patent contained 91 sheets of drawings and 232 columns of printed text.

■ There is no objective standard by which to judge the adequacy of a best mode disclosure. *Application of Sher-*

*wood,* 613 F.2d 809 (CCPA 1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). The scope and magnitude of what must be disclosed is also influenced by the character of the particular art involved. The disclosures required in a patent related to an internal combustion engine, for example, are limited by the fact that such would deal with a standardized product which is well known to practitioners in the art. By contrast, there is no standardization of military weaponry since each weapon is unique unto itself. Though weapons are characterized by certain conventional details which are well known to those in the weapons art, there is much which is unique to every particular weapon. Bearing that distinction in mind, it is plaintiffs' position that it was incumbent on Colt to fully disclose the interchangeability specifications for the M–16 and its component parts to satisfy the best mode requirement of § 112.

▌ Of the many reported cases, the following are deemed to articulate the application of the best mode requirement. In the absence of countervailing evidence, the best mode for carrying out the claimed invention can be presumed to be the existing commercial embodiment. *Union Carbide Corp. v. Borg-Warner Corp.,* 550 F.2d 355 (6th Cir.1977).

In *Phillips Petroleum Co. v. Richardson Carbon Co.,* 293 F.Supp. 555 (W.D. Tex.1968), the best mode of practicing the claimed invention was embodied in Phillips' commercial product which could not be produced from information disclosed in its patent. That finding was fortified by the existence of licensing agreements negotiated by Phillips, which required the licensees to keep the process for manufacturing its commercial product a closely guarded secret. To that degree, the factual background of Phillips closely parallels what the evidence in this cause reveals.

A patent which only mentioned a critical material by commingling it with other materials failed, by that commingling, to disclose the best mode for practicing the invention. *Dale Electronics, Inc. v. R.C.L.*

*Electronics, Inc.,* 488 F.2d 382 (1st Cir. 1973).

▌ There is a failure of the best mode requirement if information which is essential to production of the product is not disclosed. *Flick-Reedy Corp. v. Hydro-Line Mfg. Co.,* 351 F.2d 546, 550–51 (7th Cir.1965), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966).

There was a failure to disclose the best mode when, even though, as the patentee argued, other programs were available, it had retained as a trade secret that which it employed in its commercial product. *White Consolidated Industries, Inc. v. Vega Servo-Control, Inc.,* 214 U.S.P.Q. 796 (S.D. Mich.1982), *aff'd* 713 F.2d 788 (Fed.Cir. 1983).

The disclosure of the second best embodiment, where the patentee had a better embodiment, failed to disclose the best mode. *Engelhard Industries, Inc. v. Sel-Rex Corp.,* 253 F.Supp. 832 (D.N.J.1966), *aff'd* 384 F.2d 877 (3d Cir.1967).

The cases principally relied on by Colt arose when § 112 was pleaded as a defense to a suit for patent infringement by defendants who had copied and were competing in the sale of the patented product. The argument in *In re Gay, supra,* was that there was no best mode disclosure because the patent failed to specify the number, size and placement of perforations in a rice cooker. The court said that, despite that omission, any person skilled in the art would know that a number of perforations were necessary, and that the patented product could be produced by following the patent without undue experimentation, or perhaps with no experimentation. The court in *In re Strahilevitz,* 668 F.2d 1229 (CCPA 1982), found that the undisclosed information was already known in the prior art. The accused infringer in *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66 (3d Cir.1972), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 had employed a metal worker to copy the patentee's patented product.

The court in *Standard Oil Co. v. Montedison S.p.A.*, 494 F.Supp. 370 (D.Del. 1980), *aff'd* 664 F.2d 356 (3d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), said that the best mode requirement is satisfied if the specification is sufficient to guide one skilled in the art to its successful application. The accused infringer argued in *International Telephone and Telegraph Corp. v. Raychem Corp.*, 538 F.2d 453 (1st Cir.1976), *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167, that the best mode for production of an improved type of wire designed for use in the F–111 military fighter plane was not disclosed because the patentee had failed to disclose a secret compound employed in production of the patented wire.

Apparently accepting the findings of the trial court in *International Telephone and Telegraph Corp. v. Raychem Corp.*, 188 U.S.P.Q. 214 (D.Mass.1975), that the accused infringer had obtained a sample of the patentee's wire through which, after an analysis of its structure, it had been able to produce the patented product with "no difficulty," the court held that § 112 disclosures were sufficient. *Illinois Tool Works, Inc. v. Solo Cup Co.*, 179 U.S.P.Q. 322 (N.D.Ill.1973), presents a situation comparable to that in *Raychem*. Similarly, the court in *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 588 F.Supp. 1455, 221 U.S.P.Q. 426 (N.D.Tex.1983), said that the ease with which the infringer had formulated the patented product was an indication that the patent disclosures were sufficient.

None of those cases derogates at all from the determinative inquiries of, what did the inventor know? what did he consider the preferred embodiment for using his invention? and did he withhold information known to him which would enable the public to reap the full benefits of competition upon the expiration of the patent?

The preferred embodiment of the invention in each of Colt's patents was the improvement of the M–16 military weapon, with the essential requirement that each of the parts modifications be fully interchangeable with the corresponding part in every M–16 ever produced. Plaintiffs assert the position that the mandate of § 112 could be satisfied only by the disclosure of the critical interchangeability specifications. This court has expressly recognized the criticality of interchangeability in its preliminary injunction issued in the *Springfield* case, when it said:

"3. The evidence is clear and convincing that the use of the designation 'M–16' in Springfield's contract with the government of El Salvadore amounts to a representation that the Springfield XM–15 rifle is in all respects the equivalent and fully interchangeable with the U.S. Army M–16, with full parts interchangeability, when none of such is now shown by the evidence to be the case in any important respect."

There appears a sharp contrast between Colt's position, taken in pursuit of the *Springfield* preliminary injunction, that complete interchangeability was the one factor of extreme importance, and that failure of full interchangeability could be fatal to the combat infantryman, and its present position that parts interchangeability is a common feature of all mass produced products. Of Colt's present position, plaintiffs observe that, "What Colt Industries assiduously avoids is the fact that interchangeability is not a means for maintaining a monopoly in those other industries as it is for the standard U.S. military rifles." Colt's present position ignores the fact that the firearms industry is not standardized, as, for example, the automobile industry. Mr. Waterman recognized that distinction when he testified:

"I think one of the things that has happened over a period of time in the firearms business is you normally try and utilize, if possible, standard parts, and almost 100 percent of the time it's not possible."

Thus Colt's present position that M–16 parts can be produced without undue experimentation is rejected by statements by its own experts in *Springfield* and in the posture of the present case. M–16 parts might be produced through reverse engi-

neering, but, if so, that would entail a massive undertaking. Use of reverse engineering is also hindered by provisions in Colt's contracts with the Government, that no scrap parts be sold to unauthorized persons unless such parts are damaged and unrepairable.

The situation in *Wilden Pump & Engineering v. Pressed & Welded Products*, 199 U.S.P.Q. 390 (N.D.Cal.1978), *aff'd* 213 U.S.P.Q. 282 (9th Cir.1981), is interesting. The patent involved had omitted disclosure of dimensions and tolerances for an activator valve employed in the patentee's pump. The court rejected a § 112 defense upon its findings that the accused infringers had been able to mass produce that valve by using ordinary engineering practices to supply that information and permit the mass production of the part. That accused infringer had no substantial difficulty in duplicating the patented item by reverse engineering. That same consideration is doubtless present in almost all situations which deal with standardized products. Standardization tends to produce a field of prior knowledge essential to permit the copying of the patentee's commercial product with little effort by the application of reverse engineering. The totality of the undisputed evidence indicates that that is not true in the art of military weaponry. As plaintiffs argue, this is a unique situation which must be resolved independently by this court, guided, however, by the precedent of decided and controlling decisions.

Plaintiffs' statement is deemed to fully and clearly present the issue of "best mode" involved here, and the conclusion. Framed in their language, it is:

To consider the issue [of best mode] in proper perspective, we must look to the facts to clearly sort out the unique fact situation we have here:

1. First, we have here the uncommon situation where the critical dimensions and tolerances cannot be reverse engineered;

2. Second, we also have here the uncommon situation where interchangeability is an absolutely essential requirement of the customers, amounting to a situation of life and death on occasion;

3. Third, we have the uncommon situation that this absolutely essential requirement must be maintained for production extending of (sic) a period of very many years;

4. Fourth, we also have here the situation where the dimension and tolerances necessary for interchangeability were known by the inventor to be important at the time of filing the patent applications; and

5. Fifth, we have the situation where the patent applications are on an improved component which is interchangeable with and serves as a replacement for a corresponding component of a much larger standard U.S. product, which even more uniquely has the U.S. standards privately and secretly owned by the patent applicant.

Applying the above facts under the standard of Section 112 must [lead to] the conclusion that at least the crucial interchangeability specifications should have been in the patent.

There can be no question that the preferred embodiment of each of the patents is the incorporation of the patented structure into the standard M–16 military rifle. That is the only mode for practicing the invention since it seems clear that the parts could not be employed in any other existing weapon. That finding and conclusion merely fortifies the uniqueness of this situation, which was previously noted. As also previously noted, a Colt expert said that the arms manufacturer seeks a standardized embodiment for general use which is unattainable almost 100 percent of the time.

Plaintiffs' careful analysis of Colt's receiver and bolt assist patent (No. 3,236,-155), trigger mechanism patent (No. 3,292,-492), and magazine patent (No. 3,619,929) is seen to apply to all of the patents in issue. Each describes the claimed invention in a generalized way, without disclosing the critical details of construction and, most importantly, the elements of structural de-

tail and tolerances required to achieve the paramount requirement of full interchangeability of parts among all M–16 weapons produced over more than 20 years. That information was essential if the patent disclosures were to satisfy the § 112 requirement that the best mode for practicing the invention be disclosed. There can be no doubt that all of this critical information was known to Colt's patent applicants when the patent applications were processed.

A consistent pattern emerges when the several patents are compared. In each, Colt failed to disclose that information which was essential to disclosure of the best mode then known to the patentee for practicing the claimed invention. Colt obviously sought to insulate its position by the provisions in its licensing agreements which were designed to forestall disclosure of such concealed information which Colt claimed as its proprietary property under the laws related to trade secrecy. To that end, it has transmitted threatening correspondence to some of its licensees to further insulate that information from disclosure to other persons. It seems obvious that such actions were designed to perpetuate Colt's monopoly on the production of the M–16 rifle and its component replacement parts. The picture which emerges is that Colt reaped the benefits of its limited monopoly under the patents and seeks to extend it by means of planned subterfuge and a near total failure of compliance with the requirements imposed by § 112.

Plaintiffs rely on both equity and the doctrine of federal supremacy as supporting their position that the claimed trade secrets are invalid and unsupportable. Colt's response to that argument is its assertion, in effect, that if there was noncompliance with § 112, the only available remedy is the invalidation of its patents, most of which have already expired. Its corollary argument is that its misuse of the patent laws cannot affect its proprietary interest in its claimed trade secrets under state law. That argument is unsound.

Under the doctrine of federal supremacy, the patent laws do preempt application of state trade secrecy laws whenever enforcement of the state law would conflict with the accomplishment and execution of the full purpose and objectives of the patent laws as enacted by Congress. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). The patent laws enacted under the Constitution are the supreme law of the land which cannot be set at naught and the benefits thereof denied by the application of state law. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 229, 84 S.Ct. 784, 787, 11 L.Ed.2d 661 (1964). A state may not apply its own laws in such a way as would extend the monopoly of an expired or invalid patent or afford any protection which is inconsistent with the objectives of the federal patent laws. *Ibid.* at 231, 84 S.Ct. at 788. The nature and extent of the legal consequences of the expiration or invalidation of a patent are federal questions which must be answered by the application of the patent laws and the policy which they adopt. *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 255–256, 66 S.Ct. 101, 104–105, 90 L.Ed. 47 (1945). "Hence any attempted reservation or continuation in the patentee * * * of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent law."

Both *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), and *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), upon which Colt relies, are inapposite. In *Aronson,* no patent had been issued although a patent application had been filed, while in *Kewanee* there had been no application for a patent. Thus, the court was not dealing with any potential conflict between the patent laws and the state laws of trade secrecy.[1]

---

1. In this context, plaintiffs assert that the opinion in *Colt Industries v. Springfield Armory, supra,* should be accepted as the law of the case, citing *Gindes v. United States,* 740 F.2d 947 (Fed.Cir.1984). The reference is to language in that opinion that courts generally refuse to re-

As stated above, the court finds that the disclosures made in Colt's several M–16 parts patents are insufficient to satisfy either the enablement or best mode requirements of § 112. It follows that each of those patents was invalid from its inception and that any claim of trade secrecy as to the nondisclosed information is likewise invalid.

## REMEDY

The remaining issues devolve into a determination as to the appropriate remedy. Plaintiffs assert that Colt should be required to disgorge its claimed trade secrets. Its argument is not limited to those items which were required to be disclosed. It also argues that Colt should disgorge all material which it claims as its trade secrets, because of its misuse of the patent system and because of its unjust enrichment by use of the invalid patents for which it had wholly failed to provide the consideration which the patent laws require. Reiterating, that consideration is full and complete disclosure which would enable the public to freely practice the invention once a patent has expired.

That position is supported by *Dow Chemical Co. v. American Bromine Co.*, 210 Mich. 262, 177 N.W. 996 (1920), which held that a patentee cannot, in equity, claim trade secrecy for conventional information which could readily have been discovered had the required disclosures been made in its patent. The trade secrecy laws cannot be invoked to protect production specifications which could have been reverse engineered had the critical interchangeability specifications been properly disclosed. *See Rototron Corp. v. Lake Shore Burial Vault Co., Inc.*, 712 F.2d 1214 (7th Cir. 1983); *ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 273 N.E.2d 393 (1971). Moreover,

the period for the enforcement of the claimed trade secrets, which could have been discovered by reverse engineering, would doubtless have ended years ago had the essential specifications been disclosed. *See Syntex Ophthalmics, Inc. v. Novicky*, 591 F.Supp. 28 (N.D.Ill.1983), *aff'd* 28 Patent, Trademark & Copyright J. (BNA) 717 (Fed.Cir.1984).

The clean hands doctrine also bears upon this phase of the case. As stated by the Court in *Precision Instrument Manufacturing Co. v. Automotive Machinery Co.*, 324 U.S. 806, 814, 815, 65 S.Ct. 993, 997, 998, 89 L.Ed. 1381 (1945):

> "Thus while equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue."

Colt must bear the consequences of its flagrant abuse of the patent laws.

Colt's assertion that Christianson is guilty of having induced the breach of its licensing agreements, both as a defense to plaintiffs' motion and as the basis for its counterclaims, is not sustained. Although Christianson is a former Colt employee, it is not alleged that he has been guilty of corporate espionage, theft, bribery, or deception in his obtaining the Colt specifications which he has used. They were supplied to him by the governments of the Philippines and Singapore.

Moreover, the license agreements themselves are tainted by Colt's misuse and evasion of the patent laws. As plaintiffs suggest, had the required disclosures been made in the patents, the supplementary information would probably have been discovered by others long before the now-elapsed time of about twenty years. Secrecy would thus have evaporated with the

open what has already been decided. *See Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). Previous discussion of *Springfield* herein delimits this court's interpretation of that opinion, which clearly indicated that it will not be presumed that the Federal Circuit did decide an issue which was not before it. Plaintiffs' reliance on the doctrine of the law of the case is thus misplaced.

issuance of the patents. *Forest Laboratories v. Pillsbury Co.,* 452 F.2d 621, 624 (7th Cir.1971). Colt's failure to make the required disclosures not only invalidates its patents but also its present claims of trade secrecy. The licensing agreements themselves can stand in no better stead without undermining the purposes of the patent laws.

The cases cited by Colt are deemed inapposite. *E.g., American Can Co. v. Mansukhani,* 728 F.2d 818 (7th Cir.1984); *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677 (7th Cir.1983); *E.I.M. Co. v. Philadelphia Gear Works, Inc.,* 102 F.Supp. 14 (S.D.Tex.1951), *aff'd* 205 F.2d 28 (5th Cir. 1953). None of those cases involved a situation such as this in which the claimed trade secrecy information had been withheld from disclosure by the patentee in violation of § 112.

Little need be said about Colt's cross-motion for summary judgment. As the court said in *First National Bank v. Insurance Company of North America,* 606 F.2d 760, 766 (7th Cir.1979), the moving party must present admissible evidence showing its entitlement to judgment, not just contentions, assertions of counsel, or hearsay. It cannot be found that Colt has met that burden.

Plaintiffs' motion for summary judgment must be allowed as to liability on Counts I and II, and Colt's cross-motion for summary judgment must be denied.

IT IS ORDERED, therefore, that plaintiffs' motion for summary judgment is ALLOWED as to liability on Counts I and II of the Complaint, and defendant's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that plaintiffs shall submit to the court and serve on defendant, within 30 days hereafter, its proposed final judgment order on liability, which shall be consistent with this opinion, on which the defendant shall file and serve any comments as to form within 10 days after service.